IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

MICHAEL W. FREDERICK and
DIANE H. FREDERICK,

      Plaintiffs,

v.                                      Case No. 2:18-cv-01077

WEST VIRGINIA DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al.*,

      Defendants.

## PROPOSED FINDINGS AND RECOMMENDATION

Following the transfer of this matter from the United States District Court for the Northern District of West Virginia, due to a perceived conflict of interest, this matter is assigned to the Honorable Thomas E. Johnston, Chief United States District Judge, and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and a recommendation for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Pending before the court are the following motions: a Motion to Dismiss filed by Kathy Bradley, Lisa M. Driscoll, Anita B. Duncan, Rebecca Hall, Shelly Nicewarner, and the West Virginia Department of Health and Human Resources (hereinafter "the DHHR Defendants") (ECF No. 13); a Motion to Dismiss filed by Debora Barthlow, Children's Home Society of WV, Emily R. Hawver, Safe Haven Child Advocacy Center, and Victoria Slater-Madert (hereinafter "the CHS Defendants") (ECF No. 34); an Amended Motion to Dismiss filed by the DHHR Defendants (ECF No. 37); a Motion to

Dismiss filed by Vicki L. Barnard, CASA of the Eastern Panhandle, Inc., and Rebekah Overstreet (hereinafter "the CASA Defendants") (ECF No. 68); a Motion to Dismiss filed by Jefferson County, Jefferson County Prosecuting Attorney's Office, and Jefferson County Sheriff's Department (ECF No. 71); a Motion to Dismiss filed by Lyndsey W. Matschat (ECF No. 73); a Motion to Dismiss filed by Brandon C.H. Sims (ECF No. 75); a Motion to Dismiss filed by Hassan S. Rasheed (ECF No. 77); a Motion to Dismiss filed by Scott Demory, Steven Holz, V.C. Lupus, Sharon Moskowitz, R. Rjasko, Defendant Thomas, and J.P. Windle (hereinafter "the Deputy Sheriff Defendants") (ECF No. 79); a Motion to Dismiss filed by Pete Dougherty and Ralph A. Lorenzetti (ECF No. 81); a Motion to Dismiss filed by Blue Ridge Elementary School, Mary Brittingham, Bandon Caton, Bondy S. Gibson, Jefferson County School District, and Susan T. Zigler (hereinafter "the School Defendants") (ECF No. 83); and a Motion to Dismiss filed by Rene Ellenberger, Abigayle Kohler[1], and National Youth Advocate Program (hereinafter "the NYAP Defendants") (ECF No. 86).

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On June 21, 2018, the plaintiffs filed an excessively lengthy Complaint in the United States District Court for the Northern District of West Virginia. The Complaint, which is 247 pages in length, contains 1301 paragraphs asserting 76 counts/claims for relief against 39 defendants. All of the claims arise out of the defendants' roles in criminal prosecutions and abuse and neglect proceedings instituted against Michael W. Frederick in the Circuit and/or Magistrate Courts of Jefferson County, West Virginia, which were prosecuted between June 11, 2014 and June 28, 2017.

---

[1] The NYAP Defendants' motion documents indicate that the proper spelling of this defendant's last name is "Koller." Accordingly, the undersigned will use that spelling from this point forward.

Due to a perceived conflict of interest, Chief Judge Gina M. Groh transferred the matter to this United States District Court. Following service of process, each defendant has filed a Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The Motions to Dismiss are fully briefed and ripe for adjudication. Before addressing the defenses raised in the Motions to Dismiss, the undersigned believes a comprehensive recitation of the facts contained in the Complaint will be helpful.

On June 11, 2014, S.F., the eight-year-old daughter of Michael Frederick ("Michael"), disclosed to Mary Brittingham ("Brittingham"), a counselor at Blue Ridge Elementary School ("BRES"), that "her father . . . touched her and [did] other things to her in her bedroom." (ECF No. 1 at 13, ¶ 68). During the same conversation, S.F. stated that her aunt, K.J., and her grandfather, who had allegedly been blamed for "touching" her, had not actually done so. (*Id.* at 12, ¶¶ 66, 67).

As a result of these disclosures, and as required by state law, Brittingham contacted the West Virginia Department of Health and Human Resources' ("DHHR") Child Protective Services ("CPS") and made a report about S.F.'s abuse allegations. (*Id.*, ¶ 72). Brittingham assisted a DHHR social worker in the completion of a Danger Assessment Intake Report, finding that no present danger was indicated. (*Id.*, ¶ 73). S.F. was held in the school office and questioned by Lisa Driscoll ("Driscoll"), a DHHR employee, without the knowledge or consent of her parents. (*Id.* at 13-14, ¶ 75). S.F. was subsequently permitted to ride the bus to her great grandmother's (Michael's grandmother) house, where Diane Frederick ("Diane") (S.F.'s grandmother) also lived.[2] (*Id.* at 16, ¶¶ 90-92).

---

[2] The plaintiffs' failure to identify by name both Michael's grandmother and his wife (or ex-wife), who is also referred to in places as S.F.'s mother, make the Complaint difficult to interpret at points and further makes it burdensome to refer to these individuals herein. From this point forward, the undersigned will refer to Michael's grandmother as "S.F.'s great grandmother." The undersigned will refer to Michael's wife or ex-wife as "Michael's wife."

The Complaint suggests that this house is "where S.F. was already staying for the summer -- her home away from home." (*Id.* at 19, ¶ 103).

A CPS referral was also made to law enforcement. (*Id.* at 14, ¶ 77). Sharon Moskowitz ("Moskowitz"), a Deputy Sheriff with the Jefferson County Sheriff's Department, responded to BRES, where she met with Driscoll and Brittingham and was provided with Brittingham's statement concerning S.F.'s disclosures and S.F.'s school enrollment forms. (*Id.*, ¶¶ 78, 79). Driscoll and Moskowitz left the school and drove to Michael's residence in Harper's Ferry, West Virginia, to investigate and attempt to meet with the residents of the home, but no one was there. (*Id.* at 15-16, ¶¶ 87, 88). Moskowitz contacted Scott Demory ("Demory"), a Detective with the Jefferson County Sheriff's Department, who commenced an investigation of S.F.'s claims. (*Id.* at 16-17, ¶¶ 94, 95).

Later that evening, Driscoll and Deputy Sheriff R. Rjasko ("Rjasko") arrived at Michael's residence to serve him and his wife with CPS paperwork, including a Temporary Protection Plan. (*Id.* at 17, ¶ 97). Michael and his wife denied S.F.'s allegations and stated that, while they were watching a movie in their bedroom, S.F. had woken up in her bedroom and yelled "They were just in here!" Michael's wife assured S.F. that she was just having a "bad dream" and allowed her to come into their bedroom to sleep for the night. (*Id.*, ¶ 98). The plaintiffs allege that Driscoll and Rjasko did not take any steps to confirm any other information concerning S.F.'s statements to the school and DHHR staff. (*Id.* at 18, ¶ 99).

Driscoll advised Michael and his wife that S.F. would need to stay at her great grandmother's house as part of a Temporary Protection Plan that was being put into effect, and then presented them with some forms, which the plaintiffs allege were signed under duress. (*Id.* at 18-19, ¶¶ 100, 101). The Temporary Protection Plan, which was in

effect until June 18, 2014, was also presented to S.F.'s great grandmother. It indicated that S.F. was to have no contact with Michael, his wife, her aunt K.J., or her grandfather. (*Id.* at 19-20, ¶ 104).

On June 12, 2014, Demory, working with DHHR staff, scheduled a forensic interview of S.F. by Children's Home Society ("CHS") staff, which took place on June 13, 2014 at Safe Haven Child Advocacy Center ("CAC"). (*Id.* at 20-21, ¶¶ 109-111). S.F. was interviewed for about three hours by Victoria Slater-Madert ("Slater-Madert"), Child and Family Services Supervisor for CHS. (*Id.* at 22, ¶ 116). Demory was also present at the interview. (*Id.*, ¶ 117). The plaintiffs take issue with the protocol and methods used by Slater-Madert during the interview and the fact that the interview was done without a court order.

The plaintiffs allege that S.F. made inconsistent and implausible statements during the interview, and that, upon returning home, she told her great grandmother and another aunt, Y.A., that she had lied about her father touching her, that "he didn't do it," and "it wasn't true." (*Id.* at 22-24, ¶¶ 120, 122, 124). S.F.'s aunt, Y.A., subsequently recorded conversations with S.F. in which she continued to recant her allegations that her father had sexually abused or assaulted her and admitted that she had lied about it. (*Id.* at 24, ¶¶ 125, 126). The plaintiffs contend that Demory failed to interview any of the other family members, who allegedly would have provided information or evidence demonstrating Michael's innocence. (*Id.* at 24-25, ¶ 127).

Rather, in an alleged rush to judgment, on June 14, 2014, Demory swore out a criminal complaint, and secured a warrant for Michael's arrest on charges of sexual assault and sexual abuse by a parent or guardian. (*Id.* at 25, ¶ 129). Later that night, Jefferson County Deputy Sheriffs Rjasko, Thomas, and Windle arrived at Michael's house

to arrest him.  (*Id.* at 25-26, ¶¶ 130-136).  Windle and Rjasko allegedly slammed Michael onto the back deck and Thomas threatened to Taser him if he didn't comply with being handcuffed.  (*Id.* at 26, ¶ 137).  One of these defendants allegedly stated, "This is what happens when you molest children."  (*Id.*)  They allegedly continued to verbally harass him as they took him to the Eastern Regional Jail.  (*Id.*, ¶ 138).

On June 15, 2014, defendant Windle filed another criminal complaint charging Michael with Obstructing an Officer and Fleeing an Officer.  (*Id.* at 27, ¶ 141).  Michael appeared before a magistrate and was released on bond (which he claims was excessive).  (*Id.*, ¶ 142).  At that time, Michael was also serving a period of probation for a prior conviction in the United States District Court for the Eastern District of Virginia on charges of interstate transportation of a stolen vehicle and discharge of pollutants into waters of the United States.  The probation period was set to expire on July 21, 2014.  (*Id.* at 28, ¶ 151).

On June 16, 2014, V.C. Lupus, a Sergeant with the Jefferson County Sheriff's Department, contacted the Probation Office in the Eastern District of Virginia and advised Carolyn Nulf of Michael's arrest in West Virginia and provided her with a copy of the arrest warrant.  (*Id.* at 29, ¶ 152).  Nulf thereafter secured a warrant for Michael's arrest on a probation violation.  (*Id.*, ¶ 153).

During this same time period, Jefferson County Assistant Prosecuting Attorneys Brandon C.H. Sims ("Sims") and Hassan A. Rasheed ("Rasheed") assumed responsibility of Michael's criminal prosecution.  (*Id.* at 28, ¶¶ 147, 148).  Lyndsey W. Matschat ("Matschat"), another Jefferson County Assistant Prosecuting Attorney, was assigned as counsel for DHHR in the prosecution of the abuse and neglect case against Michael and his wife.  (*Id.*, ¶ 149).  The plaintiffs allege that Sims, Rasheed, and Matschat, as well as

their supervisor, Jefferson County Prosecuting Attorney Ralph Lorenzetti, were aware of all of these facts, and directed and coordinated the investigation by the Sheriff's Department.  (*Id.* at 28, 29, ¶¶ 147-150, 155).

On or about June 17, 2014, a hearing was held in the abuse and neglect matter before Circuit Judge Michael D. Lorensen during which DHHR was awarded the care, custody and control of S.F., a *guardian ad litem* ("GAL") was appointed for S.F., and counsel was appointed for each of the parents.  (*Id.* at 30, ¶ 160).  The plaintiffs allege that Driscoll and Matschat filed the abuse and neglect petition, despite having knowledge of S.F.'s inconsistent statements, and failing to investigate and interview the other family members who could provide evidence of innocence.  (*Id.* at 30-31, ¶¶ 159, 161).

On June 18, 2014, S.F. underwent a forensic examination which rendered no physical evidence of sexual abuse.  (*Id.* at 31, ¶¶ 154, 165).  The examination results were provided to defendant Demory, who turned it over to Sims, Matschat, and Driscoll.  (*Id.* at 32, ¶¶ 167, 169).  Shortly after the examination, S.F. again told her great grandmother and Y.A. that she had lied about the allegations against her father.  (*Id.* at 31-32, ¶ 166).  The plaintiffs claim that Sims, Rasheed, Matschat, and Driscoll willfully ignored this evidence of innocence and that their respective supervisors were also aware of this evidence and willfully ignored it.  (*Id.* at 32-33, ¶¶ 170, 171).

On June 19, 2014, a hearing was held in the Eastern District of Virginia concerning Michael's federal probation violation.  (*Id.* at 33, ¶ 173).  Demory testified at the hearing and admitted that he did not investigate or try to corroborate S.F.'s various statements made during her school interview, and that he was unaware of S.F.'s prior allegations of abuse by her mother's former boyfriend, or her alleged recantations of the abuse by her father, and had not investigated the same.  (*Id.* at 33-34, ¶ 174).  Diane Frederick also

testified during the probation revocation hearing and disclosed that S.F. had admitted to lying during her interview. (*Id.* at 34-35, ¶ 175). Michael's wife also testified about S.F.'s prior unsubstantiated allegations of abuse by her ex-boyfriend, S.F.'s history of lying, and the circumstances surrounding Michael's arrest on the West Virginia charges on June 14, 2014. (*Id.* at 35-36, ¶ 176). She denied that Michael attempted to flee when he was arrested. (*Id.*)

The Complaint alleges that, during the probation hearing[3], Demory learned about S.F.'s prior unsubstantiated allegations of abuse by her mother's former boyfriend in Loudon County, Virginia. (ECF No. 1 at 37, ¶ 179). Sometime thereafter, Demory spoke with a detective in Loudon County, Virginia about those allegations and advised her of the West Virginia allegations. (*Id.* at 41-42, ¶¶ 194-198).

A second hearing was held in the Eastern District of Virginia on June 23, 2014. (*Id.* at 38, ¶ 183). Diane Frederick testified about a meeting with DHHR officials concerning S.F.'s guardianship; about her understanding of what occurred on the night in question; and about her knowledge concerning S.F.'s prior allegations of abuse. (*Id.* at 38-39, ¶ 186). Michael's wife again testified about S.F.'s prior allegations of abuse and about the night of the alleged incident and stated that there was no opportunity for Michael to be alone in bed with S.F. (*Id.* at 40, ¶ 187). Michael also testified and denied having ever sexually abused his daughter. (*Id.* at 40-41, ¶ 188). The federal judge ultimately continued the revocation proceedings until after Michael's preliminary hearing on the West Virginia criminal charges. (*Id.* at 41, ¶ 191). The Complaint again asserts that Sims,

---

[3] The Complaint states that Demory learned of the prior abuse allegations on July 19, 2014, but the undersigned believes that is a typographical error.

Rasheed, Demory, and their supervisors were aware of this evidence, yet willfully continued pursuit of the criminal charges. (*Id.* at 37, 41, ¶¶ 180, 181, 192, and 193).

On June 30, 2014, Driscoll and Anita B. Duncan ("Duncan"), another DHHR employee, met with S.F.'s great grandmother and Diane and advised that S.F. was now being streamlined for adoption within one year. (*Id.* at 43, ¶¶ 201-205). Duncan also allegedly insisted that Diane and Y.A., her daughter, move out of the great grandmother's house. (*Id.* at 43-44, ¶ 206). Thus, on July 1, 2014, Diane moved to Berryville, Virginia, and Y.A. moved in with her fraternal grandmother in Ashburn, Virginia, where she allegedly remains. (*Id.* at 44, ¶ 207). Diane's subsequent requests for biweekly visitation with S.F. were denied. (*Id.*, ¶ 208).[4]

On June 30, 2014, Judge Lorensen appointed a volunteer advocate with CASA of the Eastern Panhandle ("CASA"), Rebekah Overstreet ("Overstreet"), to gather information, attend Multidisciplinary Team ("MDT") meetings, and perform other duties and responsibilities of a Court Appointed Special Advocate in the abuse and neglect matter. (*Id.* at 44-45, ¶ 210). On July 2, 2014, Overstreet was allegedly made aware of S.F.'s recantations and provided copies of the recordings containing her admissions that she lied during her interview with Slater-Madert. (*Id.* at 45, ¶ 211).

On July 1, 2014, Judge Lorensen held a prehearing on the Petition for Termination of Parental Rights. During the hearing, Matschat requested that a privilege log created by Brittingham pertaining to redacted portions of her report be filed under seal. (*Id.*, ¶¶ 213, 214). Defendant Sims was present at this hearing. (*Id.* at 46, ¶ 219).

---

[4] These allegations appear to form the basis of Diane Frederick's claims for relief under 42 U.S.C. § 1983 for alleged violations of her Fourteenth Amendment rights, and under Article III, § 10 of the West Virginia Constitution.

On July 2, 2014, a preliminary hearing was held before Magistrate William Senseney in Michael's criminal cases to determine whether there was probable cause for the charges. (*Id.* at 47, ¶ 222). Sims called Slater-Madert to testify about her interview of S.F. on June 13, 2014, and to introduce the audio recording thereof, which was apparently very poor. (*Id.* at 47-48, ¶¶ 224-226). Michael was represented by attorney Sherman Lambert, who moved to strike the recorded evidence and requested the opportunity to cross-examine the State's witness and to call witnesses on Michael's behalf, all of which was denied by the court. (*Id.* at 47-50, ¶¶ 224-237). The Complaint alleges that Sims and Rasheed knew that there was no probable cause for any of the criminal charges. (*Id.* at 50-51, ¶¶ 236, 239). However, the court found probable cause for all of the charges and allowed them to proceed.

On July 3, 2014, Michael was released on home confinement with electronic monitoring by the Virginia federal judge. (*Id.* at 51-52, ¶¶ 241, 242). That same day, Driscoll and another DHHR worker went to S.F.'s great grandmother's house and removed S.F. from her care because, allegedly based on "jail recordings" made of telephone conversations between Michael and others, they did not believe she could keep S.F. safe. (*Id.* at 52, ¶¶ 246, 247). S.F. was taken to DHHR offices where she met with Driscoll and her GAL and told them she had lied to get her dad in trouble. (*Id.* at 53, ¶ 248). She admitted that she had kept a diary, which she had hidden in a clothes basket at her great grandmother's home. (*Id.* at 53-54, ¶¶ 248, 255). S.F. was subsequently placed in foster care.

During a later MDT meeting attended by Matschat, Duncan, and the GAL, discussions were allegedly held with Michael's wife about their concerns about her ability to reunify with S.F. if she continued to have contact with Michael. (*Id.* at 53, ¶ 249). On

July 3, 2014, DHHR recommended that Michael's wife be permitted supervised visitation with S.F.  (*Id.* at 62, ¶ 289).

On July 4, 2014, Demory obtained a search warrant for S.F.'s diary, which was located and turned over to the prosecutors.  It allegedly contained entries admitting that S.F. had lied about the sexual abuse by her father.  Nonetheless, the criminal prosecution and abuse and neglect proceedings continued.  (*Id.* at 55, ¶¶ 256-261).

In mid-July, Michael's wife created a *GoFundMe* account and conducted fundraising efforts to support Michael's defense and "save her family."  (*Id.* at 57-58, ¶¶ 269-271).  On or about August 15, 2014, Michael retained attorneys Kirk Bottner ("Bottner") and Thomas Pavlinic ("Pavlinic") to represent him and Sherman Lambert ("Lambert") withdrew as counsel.  (*Id.* at 58, ¶ 272).  Sims became aware of the *GoFundMe* account and told Matschat about it.  (*Id.*, ¶¶ 273, 274).  Thereafter, Duncan and Matschat allegedly began pressuring Michael's wife to shut down the account.  (*Id.* at 59, ¶ 275).  During a subsequent MDT meeting, Matschat, Duncan, and Overstreet allegedly stepped up their pressure on Michael's wife to cease all contact with Michael if she was granted an Improvement Period in the abuse and neglect case.  (*Id.* at 59-60, ¶¶ 278).

Prior to his indictment, Sims made a plea offer to Michael to plead guilty to Sexual Abuse by a Parent, Guardian, or Custodian, or Person in a Position of Trust, which carried a maximum sentence of 20 years in prison.  Michael refused that offer, and Sims allegedly threatened to "put him away for life so that he can never be around another woman again." (*Id.* at 60-61, ¶¶ 280, 281).

On September 16, 2014, Michael was indicted by a Jefferson County grand jury on the same charges contained in the criminal complaints.  (*Id.* at 61, ¶ 283).  Sims

apparently presented to the grand jury the evidence from the Slater-Madert interview and testimony by an officer, who was not present at Michael's arrest and who is not a defendant herein. (*Id.*, ¶¶ 284, 285).

On September 18, 2014, Michael relinquished his parental rights, allegedly on the advice of his counsel, to prevent the State from developing evidence and trial strategy for his criminal case. (*Id.* at 64-65, ¶¶ 297, 298). That same day, Michael's wife was granted a Post-Adjudicatory Improvement Period. She was again allegedly pressured to vacate her home and to cease contact with Michael. Nonetheless, the Complaint states, Michael and his wife began communicating through "burner phones." (*Id.* at 62-63, ¶¶ 289-296).

During an MDT meeting on December 8, 2014, Matschat, Duncan and Abigayle Koller ("Koller"), the Clinical Coordinator of West Virginia Operations for the National Youth Advocate Program ("NYAP"), allegedly discussed the fact that S.F.'s foster parents caught her "lying all the time" and other evidence of S.F.'s questionable veracity. (*Id.* at 65, ¶ 301). On December 10, 2014, Michael's wife e-mailed Mr. Pavlinic about the MDT meeting discussions. (*Id.*, ¶ 302).

According to the Complaint, Sims, Rasheed, Matschat, and Duncan increased their ongoing efforts to erode Michael's wife's support of him and attempted to convince her not to provide alibi evidence on his behalf. (*Id.*, ¶¶ 304, 305). They allegedly convinced her to record her conversations with Michael, which she did between January 15, 2015 and March 20, 2015. (*Id.*, ¶ 306). However, when those conversations revealed no inculpatory evidence, Sims allegedly told her to stop the recordings and have no further phone contact with him. (*Id.* at 66-67, ¶¶ 307, 309). These defendants also allegedly helped her compose a fabricated written narrative about the alleged sexual abuse. (*Id.* at 67-68, ¶¶ 310, 311).

Throughout this time, Michael was on home confinement. In February of 2015, he began receiving treatment for heart palpitations and ultimately had two cardiac ablation procedures on March 25, 2015 and April 11, 2015. He also developed three stomach ulcers and suffered from kidney infections, dehydration, and subsequently had his gallbladder removed. He was hospitalized twice; once for 16 days, and once for five days. (*Id.* at 69-71, ¶¶ 319-329). He attributes his health issues to mental and emotional distress caused by the sustained criminal charges and asserts that the prosecutorial defendants specifically intended to cause him harm and distress. (*Id.*, at 69, ¶ 318).

On April 22, 2015, Michael filed a motion to be released from his probation in the Eastern District of Virginia. A hearing on that motion was set for May 8, 2015. (*Id.* at 72, ¶ 334).

On April 26, 2015, Michael's wife served him with a petition for divorce, which contained her phone number. (*Id.*, ¶ 335). That day, Michael sent a series of text messages professing his love for her and asking to speak with her about some other matters. His wife responded to the first message, stating "Stop Contacting Me!" Nonetheless, Michael sent additional messages throughout that day. (*Id.* at 72-73, ¶¶ 337, 338).

On April 28, 2015, Michael's wife met with Demory about the text messages. (*Id.* at 73, ¶ 343). The Complaint further alleges that Sims instructed her to seek a Preliminary Protective Order ("PPO") in a Virginia state court. (*Id.*, ¶ 339). The PPO was issued on April 28, 2015 and a hearing was set for May 12, 2015. (*Id.*, ¶ 341). According to the Complaint, Michael was served with the PPO on April 28, 2015. (*Id.*, ¶ 345).

On April 30, 2015, Demory apparently met with Sims and/or Rasheed about the text messages and was allegedly advised by Sims to draft a criminal complaint charging

Michael with a violation of W. Va. Code § 61-3C-14(a) for sending obscene, anonymous, harassing, and threatening communications. (*Id.* at 74, ¶¶ 347-349). The plaintiffs contend that, when Sims instructed Demory to seek the criminal complaint, she knew there was no probable cause for the charges. (*Id.* at 75, ¶ 352). Michael was arrested on those charges on May 2, 2015. (*Id.*, ¶ 355).

Sims subsequently denied knowing that the harassing communications charges had been filed, until on May 4, 2015, when she spoke with Mr. Bottner. (*Id.* at 76, ¶ 360). However, the Complaint further alleges that, prior to her conversation with Bottner, Sims told Michael's wife that she would be filing a motion to revoke Michael's bond. (*Id.*, ¶ 359). The Complaint further alleges that Sims was fully aware of Michael's upcoming hearing in the Virginia federal court on his motion to be removed from electronic monitoring and released from probation. (*Id.*, ¶ 362).

On May 5, 2015, Judge David H. Sanders signed a bench warrant for Michael's arrest and set a bond hearing on May 11, 2015. (*Id.* at 77, ¶ 363). During that hearing, Michael's attorneys expressed their concern that these additional charges were a "guise" to prevent Michael from being released from probation. (*Id.* at 77-78, ¶¶ 365, 366). Sims stated that she had been contacted by the Virginia officials, but took the initiative to file the bond revocation motion because of the new charges and that it was not a coordinated effort with the Virginia officials. (*Id.* at 79, ¶ 367).

Subsequently, an issue arose concerning which prosecutor(s) Demory had met with about the pursuit of the harassing communications charges. (*Id.* at 80-83, ¶¶ 371-380). Michael's counsel sought an evidentiary hearing on that matter and other issues of alleged prosecutorial misconduct. (*Id.* at 80-81, ¶ 377). Demory has consistently stated that he spoke with Sims about those charges. However, Sims denied knowing about them

and allegedly elicited an affidavit from Rasheed stating that he was the one to whom Demory had spoken about those charges. (*Id.* at 81-82, ¶¶ 378). The plaintiffs allege that this affidavit was fabricated to obstruct justice. (*Id.* at 82, ¶ 379). Judge Sanders ultimately denied Michael's request for a hearing and denied him bail. (*Id.* at 83, ¶¶ 380, 381).

Following his arrest, Michael was held in custody at the Eastern Regional Jail ("ERJ"). On June 24, 2014, he was brutally physically and sexually assaulted by three inmates and was required to be hospitalized for four days. (*Id.* at 83-84, ¶¶ 382, 383). He was subsequently transferred to the Potomac Highlands Regional Jail ("PHRJ") and was diagnosed with Post Traumatic Stress Disorder ("PTSD"). (*Id.* at 84, ¶ 384). Michael retained Sherman Lambert to represent him in a civil suit related to the ERJ assault and Michael underwent a psychological evaluation for use in that proceeding. (*Id.,* ¶ 386).

Between June 2015 and October 2015, Sims twice moved to continue Michael's harassing communications proceedings; once, due to Demory's scheduling conflict, and again, due to Sims' own scheduling conflict. The first motion was granted; however, the second motion was denied, with the magistrate finding that another prosecutor could try the matter for the State. (*Id.* at 85-86, ¶¶ 389-399). Michael's jury trial on the harassing communications charges went forward on October 27, 2015, with Matschat appearing as the prosecutor. (*Id.* at 87, ¶¶ 400, 401). Michael was acquitted of the harassing communications charges that same day. (*Id.* at 88, ¶ 404). The Complaint further alleges that, at the conclusion of the trial, Michael's defense counsel spoke with Prosecuting Attorney Ralph Lorenzetti and put him on notice that his assistants "had lied to the Court and needed to be held accountable." (*Id.* at 89, ¶ 405).

Subsequently, Michael renewed his motion to terminate his federal probation, which was granted in December of 2015. (*Id.* at 91-93, ¶¶ 412, 413). However, prior thereto, at a hearing on November 2, 2015, Michael requested that he again be released on bond in West Virginia. (*Id.* at 90-91, ¶ 411). Sims requested that he be placed on electronic monitoring, which was denied by Judge Sanders. (*Id.*) Thus, when Michael's federal probation was terminated, he was released on bond in West Virginia without that restriction.

Michael's lawyers also filed a motion to dismiss the remaining criminal charges based upon alleged constitutional violations and systemic prosecutorial misconduct. (*Id.* at 96, ¶ 428). During the November 2, 2015 hearing, Michael's attorneys expressed their concern that the State had withheld exculpatory evidence, largely consisting of materials and reports from the MDT meetings. (*Id.* at 97-98, ¶¶ 429). Sims conveyed the State's position that such records were confidential under W. Va. Code §§ 49-4-402(d) and 49-5-101,[5] and the State objected to their disclosure in the criminal proceeding. Judge Sanders ordered the State to produce the records *in camera*, which Sims did on November 10, 2015. (*Id.* at 100, ¶ 433). When no action had been taken by the court, and upon prompting from Michael's counsel, Sims again sent the records to Judge Sanders on February 26, 2016. (*Id.*, ¶ 438).

Hearings were held on March 7-8, 2016, during which Judge Sanders heard testimony and the parties' arguments concerning the DHHR records. (*Id.* at 101-111, ¶¶ 440-456). He ultimately found that the materials contained exculpatory or impeachment

---

[5] The Complaint also references a prior letter Sims sent to defense counsel on October 2, 2015, citing her inability to simply provide copies of the MDT materials ("DHHR records"), pursuant to W. Va. Code § 49-7-1(b)(4), which was the identical confidentiality provision prior to the recodification of the Child Welfare Act provisions into Article 2 of Chapter 49. (ECF No. 1 at 96, ¶ 427).

evidence that should be produced to the defendant under *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny. (*Id.* at 111-114, ¶ 457).

Sims subsequently sought a writ of prohibition in the Supreme Court of Appeals of West Virginia ("SCAWV") concerning the order to disclose the DHHR records and the court held oral argument on the matter. (*Id.* at 117-120, ¶¶ 465-470). On November 2, 2016, the SCAWV denied the writ of prohibition and found, *inter alia*, that the DHHR files contained "highly exculpatory *Brady* material" to which Michael had a constitutional right. (*Id.* at 120-122, ¶ 471). *See State ex rel. Lorenzetti v. Sanders*, 774 S.E.2d 19 (W. Va. 2015).

On November 17, 2016, Sims and Rasheed were served with notice that complaints had been filed against them with the West Virginia Office of Disciplinary Counsel ("ODC") based upon their conduct in the Michael Frederick matters. (*Id.* at 123-124, ¶¶ 474-475). An evidentiary hearing concerning Michael's motion to dismiss the criminal charges was scheduled on December 21, 2016. (*Id.* at 124, ¶ 479). However, Sims moved to continue that hearing until the resolution of the ODC complaints. (*Id.* at 124-125, ¶¶ 479, 480).

That same day, Sims allegedly asked Bottner for a copy of Michael's psychological evaluation that had been done in conjunction with his civil lawsuit. (*Id.* at 124, ¶¶ 476, 478). When Bottner refused to provide the report to her, Sims allegedly contacted attorney Sherman Lambert's office on December 23, 2016, and obtained a copy of the report from his secretary/wife. (*Id.* at 127, ¶ 492). The plaintiffs allege that this was a violation of Michael's rights under the Health Insurance Portability and Accountability Act ("HIPAA"), 42 U.S.C. § 1320d-6.[6] Sims allegedly faxed a copy of the evaluation to the

---

[6] To the extent that the plaintiffs have attempted to raise a claim herein under HIPAA, there is no private right of action that could support the filing of a civil lawsuit thereunder. Rather, the statute only provides for civil and criminal penalties that may be imposed on persons who improperly handle or disclose

Jefferson County Prosecuting Attorney's Office, generated a certificate of service and sent a copy to Michael's criminal defense counsel, and is also alleged to have attached a copy of the report to her response to the ODC complaint and retained a copy for herself. (*Id.* at 127, ¶ 493).

On January 2, 2017, Diane Frederick learned that Sims had obtained a copy of Michael's psychological evaluation from Lambert. (*Id.* at 130, ¶ 508). On January 3, 2017, Diane and her mother went to Lambert's office and confronted Lambert and his wife about disclosing the evaluation without a court order or Michael's authorization. (*Id.* at 131, ¶ 511). Lambert stated that he would respond to her in writing. (*Id.*, ¶ 515).

However, after Diane and her mother left his office, Lambert allegedly contacted the Berkley County Sheriff's Department and asserted that Diane had attempted to extort money and assets from him. (*Id.* at 131-32, ¶¶ 516, 517). He subsequently emailed Diane and stated that she had threatened to extort money from him and that he asked her to leave his office three times. (*Id.* at 132, ¶ 518). Diane responded to the email stating that she had recorded their conversation and there was no evidence of threats or extortion. (*Id.*, ¶ 519). Later that day, Diane was arrested by a Berkley County Deputy Sheriff for trespassing. (*Id.*, ¶ 520). Diane asserts that her arrest occurred as a direct and proximate result of Sims' actions. (*Id.*, ¶ 525).

On February 10, 2017, Bottner and Pavlinic met with the new Prosecuting Attorney[7] to discuss the remaining charges against Michael. (*Id.* at 127-128, ¶ 495). On

---

individually identifiable health information, and enforcement proceedings may only be initiated by the Secretary of Health and Human Services, or authorized state authorities. *See Logan v. Dep't of Veterans Affairs*, 357 F.Supp.2d 149, 155 (D.D.C. 2004); *see also* 42 U.S.C. §§ 1320d-d-8 and 300gg-22. Therefore, because the plaintiffs may not bring an individual civil lawsuit for an alleged HIPAA violation, the undersigned proposes that the presiding District Judge **FIND** that the Complaint fails to state a claim upon which relief can be granted with respect to the alleged HIPAA violation.

[7] According to his motion documents, Ralph Lorenzetti retired as of January 1, 2017.

March 31, 2017, the parties appeared before Judge John Yoder for a status hearing on Michael's motion to dismiss the sexual abuse charges based upon prosecutorial misconduct. (*Id.* at 128, ¶ 498). Judge Yoder set a deadline of June 1, 2017 for the State to respond to the motion. (*Id.* at 129, ¶ 503). On June 28, 2017, the State moved to dismiss the sexual abuse charges. (*Id.*, ¶ 505). The obstruction and fleeing charges had previously been dismissed by the Magistrate Court on December 22, 2015, based upon the State's Motion to Nolle Prosequi. (*Id.*, ¶ 504). Thus, all of the criminal charges against Michael Frederick were resolved in his favor.

## **STANDARD OF REVIEW**

In *Bell Atlantic Corp v. Twombly*, 550 U.S. 544, 570 (2007), the Supreme Court observed that a case should be dismissed for failure to state a claim upon which relief can be granted if, viewing the well-pleaded factual allegations in the complaint as true, and in the light most favorable to the plaintiff, the complaint does not contain "enough facts to state a claim to relief that is plausible on its face." While the complaint need not assert "detailed factual allegations," it must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Id.* at 555.

The Supreme Court elaborated on its holding in *Twombly* in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), a civil rights case. The Court wrote:

> Two working principles underlie our decision in *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. [*Twombly*, 550 U.S.] at 555, 127 S. Ct. 1955 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted). Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that

states a plausible claim for relief survives a motion to dismiss.  *Id.*, at 556. * * *

 In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.  When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

556 U.S. at 678-79.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct."  *Id.* at 678.

Furthermore, as noted in *Haley v. Virginia Dep't of Health*, 4:12-cv-0016, 2012 WL 5494306, at *2 n.2 (W.D. Va.  Nov. 13, 2012), "[t]he Fourth Circuit has not resolved whether a motion to dismiss based on the Eleventh Amendment is properly considered pursuant to Rule 12(b)(1) or Rule 12(b)(6) . . . The recent trend, however, appears to treat Eleventh Amendment immunity motions under Rule 12(b)(1) [which provides for the dismissal of claims over which the court lacks subject matter jurisdiction]."  Likewise, if the court determines at any time that it lacks subject matter jurisdiction over a claim or action, it must dismiss the same.  *See* Fed. R. Civ. P. 12(h)(3).

## <u>ANALYSIS</u>

A cogent summary of the plaintiffs' allegations is contained in their Response to the DHHR Defendants' Motion to Dismiss.  (ECF No. 91 at 2-4).  The plaintiffs assert that this civil action arises from a "faulty investigation" into sexual abuse allegations, in which the defendants were allegedly "so determined to charge and arrest Michael Frederick that they willfully ignored, or were deliberately indifferent to, overwhelming evidence" of his innocence and the lack of probable cause for the charges.  The plaintiffs further claim that the defendants "exploited" S.F.'s inconsistent statements and "demonstrably false"

allegations, which she had repeatedly recanted. The plaintiffs further allege that the defendants used inappropriate therapy methods to help S.F. "fill in the gaps" to "sell a story that would fly in court" and, through threats of the loss of a relationship with her child, intimidated Michael's wife to turn against Michael and change her story to create inculpatory evidence. The plaintiffs further allege that the defendants "conspired to conceal exculpatory evidence in order to maintain the charges against Michael and strip [him] of his parental rights based on facts they knew were untrue." (*Id.*)

The bulk of the Complaint alleges claims brought by Michael under 42 U.S.C. § 1983 grounded in alleged violations of the Fourth and Fourteenth Amendments. To the extent that the claims arise out of Michael's arrests and criminal prosecutions, the court must distinguish the basis of those claims. In *Brooks v. City of Winston-Salem*, the Court found that:

> A claim of false arrest permitted the recovery of damages from "the time of detention up until issuance of process or arraignment, but not more. *Heck* [*v. Humphrey*], 114 S. Ct. at 2371 [Other citations omitted]. However, allegations that an arrest made pursuant to a warrant was not supported by probable cause, or claims seeking damages for the period after legal process issued, are analogous to the common-law tort of malicious prosecution. [], 114 S. Ct. at 2371 [Other citations omitted].

85 F.3d 178, 181-82 (4th Cir. 1996). Michael's section 1983 claims are most analogous to claims of malicious prosecution. In fact, Michael cannot plausibly raise a claim based upon a false arrest or false imprisonment because he was arrested pursuant to a warrant. Accordingly, the court should address his Fourth Amendment claims as claims grounded in malicious prosecution.

The section 1983 claims herein also appear to be asserting violations of the Due Process Clause of the Fourteenth Amendment.

> The Due Process Clause of the Fourteenth Amendment encompasses three types of claims enforceable under § 1983: (1) claims for violations of rights enshrined in the Bill of Rights and incorporated against the states, (2) claims under the substantive component of the Due Process Clause, which "bars certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them,'" and (3) claims under the procedural component of the Due Process clause, which contains a guarantee of fair procedure. *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). Arbitrary state action gives rise to a substantive due process claim only when the action "shocks the conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 845–46 (1998).

*Harper v. Barbagallo*, No. 2:14-cv-07529, 2016 WL 5419442, at *10 (S.D. W. Va. Sept. 27, 2016). Here, the plaintiffs appear to be asserting substantive due process claims grounded in their fundamental right to familial relations or association.

> The Supreme Court has long recognized, as a component of "substantive" due process, that parents have a liberty interest in familial relations, which includes the right to "establish a home and bring up children" and "to control the education of their own." *Myer v. Nebraska*, 262 U.S. 390, 399, 43 S. Ct. 625, 67 L. Ed. 1042 (1923); *see also Troxel v. Granville*, 539 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed.2d 49 (2000) (noting that the right to familial relations is "the oldest of the fundamental liberty interests recognized") [Other citations omitted]

> * * *

> The right to familial relations is not, however, absolute . . . . The liberty interest in familial privacy and integrity is "'limited by the compelling governmental interest in the protection of children, particularly where the children need to be protected from their own parents'" *Brokaw* [*v. Mercer Cty.*], 235 F.3d [1000,] 1019 [(7th Cir. 2000)] (citation omitted), and does not include the right to be free from child abuse investigations. *Brown v. Newberger*, 291 F.3d 89, 94 (1st Cir. 2002); *Watterson v. Page*, 987 F.2d 1, 8 (1st Cir. 1993).

*Doe v. Heck*, 327 F.3d 492, 518-20 (7th Cir. 2003).

While acknowledging this right under the Fourteenth Amendment, s*ee Gedrich v. Fairfax Cty. Dep't of Family Servs.*, 282 F. Supp.2d 439, 460 (E.D. Va. 2003), the United States Court of Appeals for the Fourth Circuit has stated that the precise contours of the

right are not clearly established and "may be outweighed by a legitimate governmental interest." *Hodge v. Jones*, 31 F.3d 157, 163-64 (4th Cir. 1994). The Fourth Circuit has limited the concept of familial privacy to two areas: "(1) thwarting governmental attempts to interfere with particularly intimate family decisions, and (2) voiding governmental actions that sever, alter, or otherwise affect the parent/child relationship." *Gedrich*, 282 F. Supp.2d at 460 (quoting *Hodge*, 31 F.3d at 163). It is the second category that appears to be at issue here.

Turning to the elements of a substantive due process claim, to impose liability, the conduct of the defendants "must be so ill-conceived or malicious that it 'shocks the conscience;' mere negligence is insufficient." *Gedrich*, 282 F. Supp.2d at 460 (quoting *Miller v. City of Philadelphia*, 174 F.3d 368, 375 (3d Cir. 1999)). "In the area of child protection, 'remov[al] of a child in emergency action from the custody of a parent suspected of abusing him, *based upon some evidence of child abuse*," does not shock the conscience." *Id.* (quoting *Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 391 (4th Cir. 1990)). The undersigned will attempt to navigate the contours of the plaintiffs' section 1983 claims against the various defendants in light of this authority.

The Complaint also asserts that the conduct of the defendants constituted a conspiracy actionable under 42 U.S.C. §§ 1985 and 1986 and violated Michael's right to equal protection. Michael further assert claims under certain provisions of the West Virginia Constitution and various other causes of action under West Virginia law.

The Complaint also alleges that Diane Frederick's rights under the Fourteenth Amendment and Article III, § 10 the West Virginia Constitution were violated by the defendants' conduct, which affected her familial relationships with her granddaughter, S.F., and her daughter, Y.A. Diane further alleges a violation of her rights under the

Fourth Amendment and Article III, § 6 the West Virginia Constitution, arising out of her arrest for trespassing. Specifically, she claims that Sims' conduct in improperly obtaining a copy of Michael's psychological evaluation led to her false arrest for trespassing when she confronted the civil attorney who provided the report to Sims at his office.

Each defendant has moved to dismiss the Complaint for failure to state a claim under the legal provisions and theories cited therein and based on certain absolute or qualified immunities and statutory bars, including applicable statutes of limitations. Each Motion to Dismiss is fully briefed and ripe for adjudication. The undersigned will first address a number of claims which, regardless of the defendants against whom they are asserted, fail to state a plausible claim for relief against all defendants. Thereafter, the undersigned will address the claims against specific sets of defendants, and will discuss the various immunity and statute of limitations defenses that may be applicable to each.

### A. The DHHR Defendants' first motion to dismiss should be denied as moot in light of the filing of their Amended Motion to Dismiss.

On July 17, 2018, the DHHR Defendants filed a Motion to Dismiss (ECF No. 13) and Memorandum of Law in support thereof (ECF No. 14). However, on August 17, 2018, prior to any response by the plaintiffs, the DHHR Defendants filed an Amended Motion to Dismiss (ECF No. 37) and Memorandum of Law in support thereof (ECF No. 38), which added an additional ground for dismissal of the Complaint against those defendants. The Amended Motion has been fully briefed and is the motion upon which the court should proceed. Accordingly, it is respectfully **RECOMMENDED** that the presiding District Judge **DENY AS MOOT** the DHHR Defendants' first Motion to Dismiss (ECF No. 13).

**B.      The Complaint fails to state any plausible claims for relief under 42 U.S.C. §§ 1985 and 1986.**

The Complaint alleges that various defendants engaged in conduct that violated 42 U.S.C. §§ 1985 and 1986.  Specifically, in Counts 7, 8, 29, 30, 52, 53, 65, and 66, the Complaint contends that the County Defendants, the Prosecutor's Office Defendants, the Sheriff's Department Defendants, the DHHR Defendants, and the NYAP Defendants conspired to obstruct justice and engage in witness tampering, which violated Michael Frederick's rights under 42 U.S.C. §§ 1985(2) and (3).  In Counts 9, 31, 54, and 67, the Complaint further contends that the supervisors of the various defendants should be held liable under 42 U.S.C. § 1986 because they neglected to prevent the violations of section 1985 by their subordinates.

However, as addressed in the various Motions to Dismiss, Michael cannot state any plausible claims for relief under sections 1985 and 1986 because he has not alleged, and cannot demonstrate, that the defendants conspired to deny his right to equal protection of the laws grounded upon class-based protected status.  42 U.S.C. § 1985(2) contains two distinct sub-clauses.  The first clause addresses conspiracies involving access to federal courts, which is inapplicable here.

The second clause concerns conspiracies directed at access to state or territorial courts and requires that the conspiracy to deny civil rights be based on a violation of equal protection.  While Michael has alleged that the defendants violated his right to equal protection as an individual as compared to other individuals, nowhere in the Complaint does he allege that he was the target of a conspiracy to deprive him of his civil rights based on class-based discriminatory animus.

Michael responses assert that the defendants "classified him as a sexual predator" and "demonstrated animus towards him as a sexual predator." (*See* ECF No. 104 at 19; ECF No. 112 at 9; ECF No. 116 at 11). However, sex offenders are not a protected class. *See Cunningham v. Parkersburg Housing Auth.*, No. 6:05-cv-00940, 2007 WL 712392, at *6 (S.D. W. Va. Mar. 6, 2007) (listing various cases finding that sex offenders are not a suspect class for equal protection analysis). Thus, he cannot establish that essential element and cannot rely on section 1985(2) as a basis for relief.

Similarly, "§ 1985(3) provides relief only when the conspiracy is designed to deprive a person of equal protection or equal privileges and immunities under the laws." *Rhodes v. Smithers*, 939 F. Supp. 1256, 1271 (S.D. W. Va. 1995). "Consequently, subsection 1985(3) concerns only those conspiracies which are motivated by some racial or other class-based 'invidiously discriminatory animus.'" *Id.* The defendants have correctly asserted that Michael has not sufficiently pled discriminatory animus based on any suspect classification, and the facts do not support such a claim. The plaintiffs' responses, which focus only on the alleged conspiratorial nature of the defendants' conduct, do not even address such absence of discriminatory animus.

Because Michael has not sufficiently alleged any class-based discriminatory animus as the motivation for the alleged conspiracy, the Complaint fails to state any plausible claim for relief against the defendants under 42 U.S.C. §§ 1985(2) or (3). Additionally, claims under 42 U.S.C. § 1986 are entirely derivative of section 1985 claims. *See Womack v. Owens*, 736 F. App'x 356 (4th Cir. 2018) ("Because the complaint does not adequately allege a § 1985 conspiracy, it cannot bring a claim under § 1986."); *see also Park v. City of Atlanta*, 120 F.3d 1157, 1159-60 (11th Cir. 1997); *Weaver v. Torres*, No. Civ. A. WMN-00-1126, 2000 WL 1721344 (D. Md. Nov. 17, 2000) ("An action under

section 1986 may only be maintained in tandem with a valid claim under 42 U.S.C. § 1985(3).").  Thus, because the Complaint fails to state any plausible claims under section 1985, the claims under section 1986 also fail as a matter of law and must be dismissed.

Accordingly, the undersigned proposes that the presiding District Judge **FIND** that Counts 7, 8, 9, 29, 30, 31, 52, 53, 54, 65, 66, and 67 fail to state a plausible claim upon which relief can be granted against any of the defendants.

### C.    The Complaint fails to state any plausible claims under the Fourteenth Amendment Equal Protection Clause.

Similarly, to the extent that Counts 10, 11, 12, 13, 14, 15, 32, 33, 34, 35, 36, 37, 46, 47, 48, 49, 50, 51, 55, 56, 57, 58, 59, and 62 allege claims against various defendants under 42 U.S.C. § 1983 for violations of Michael's Fourteenth Amendment right to equal protection, those claims also fail because he has not properly alleged any basis for an equal protection claim.  The Complaint appears to be asserting a "class-of-one" equal protection claim, alleging that the defendants violated his equal protection rights by treating him differently from others similarly situated without a rational basis.  *See Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) ("Our cases have recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has intentionally been treated differently from others similarly situated and that there is no rational basis for the difference in treatment.") (Other citations omitted).

In order to withstand a motion to dismiss, the plaintiff must plead facts that plausibly demonstrate that he was treated differently from others who were similarly situated and that the unequal treatment was the result of discriminatory animus.  *Willowbrook*, 528 U.S. at 564; *see also Moss v. Clark*, 886 F.2d 686, 690-91 (4th Cir. 1989); *Gardner v. Oslin*, No. 7:12CV00108, 2012 WL 1941447, at * 3 (W.D. Va. May 29,

2012) (Equal protection claim requires showing that plaintiff was similarly-situated and unequal treatment was not rationally related to a legitimate governmental purpose). As noted by the defendants, the Complaint herein pleads no facts to establish unequal treatment by the defendants concerning similarly-situated persons. Thus, the defendants contend that the Complaint fails to establish any plausible violation of Michael's rights under the Equal Protection Clause.

As noted above, the plaintiffs' responses to several of the motions to dismiss assert that the defendants singled him out because he was an alleged sex offender. However, as the undersigned previously addressed, sex offenders are not a protected class for the purposes of equal protection claims. *See Cunningham* 2007 WL 712392, at *6. Moreover, the Complaint does not even suggest how Michael was treated differently than similarly-situated alleged sex offenders.

Thus, the undersigned proposes that the presiding District Judge **FIND** that the plaintiff's allegations are insufficient to establish a class of one equal protection claim and, therefore, the Complaint fails to state a claim upon which relief can be granted under the Equal Protection Clause of the Fourteenth Amendment. Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that Counts 10, 11, 12, 13, 14, 15, 32, 33, 34, 35, 36, 37, 46, 47, 48, 49, 50, 51, 55, 56, 57, 58, 59, and 62 fail to state a plausible claim upon which relief can be granted against any of the defendants.

### D. The Complaint fails to state a plausible claim of intentional or negligent infliction of emotional distress.

#### 1. *Intentional infliction of emotional distress*

In Count 70 of the Complaint, Michael alleges that the conduct of all the defendants was "intentional and reckless" and "extreme, outrageous and beyond all

possible bounds of decency." (ECF No. 1 at 236, ¶¶ 1229, 1230). The Complaint further alleges as follows:

> Defendants acted individually and in concert to manufacture inculpatory evidence and to conceal exculpatory evidence for the purpose of perpetrating criminal action against Plaintiff for sexual assault, sexual abuse, obstructing an officer, fleeing from an officer, and manufactured charges against Plaintiff for sending alleged obscene, anonymous, harassing, and threatening communications that were calculated to shame and humiliate Plaintiff.
>
> Defendants acted individually and in concert to intimidate[] witnesses and manipulate[] witnesses with the intention of perpetuating criminal proceedings against Plaintiff.
>
> Despite Plaintiff's exoneration, Defendants' conduct will continue to have deleterious effects on Plaintiff who will forever be associated with the false allegations advanced by Defendants.

(*Id.* at ¶¶ 1231-1233).

In Syllabus Point 6 of *Harless v. First Nat. Bank in Fairmont*, 289 S.E.2d 692, 694 (W. Va. 1982), the Supreme Court of Appeals of West Virginia (the "SCAWV") set forth the elements of an intentional infliction of emotional distress claim as "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." Such a claim is also known as the tort of outrage. *Id.* at 703. In order to establish a claim for intentional infliction of emotional distress or outrage, the plaintiff must prove the following:

> (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendants acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

*Travis v. Alcon Labs., Inc.*, 504 S.E.2d 419, 425 (W. Va. 1998). As previously noted by the SCAWV, whether the complained-of conduct is legally outrageous is a question of law to be decided by the trial court. *Hatfield v. Health Mgmt. Assocs. of W. Va.*, 672 S.E.2d 395, 404 (W. Va. 2008). To be legally outrageous, the conduct must be "more than unreasonable, unkind, or unfair; it must truly offend community notions of acceptable conduct." *Travis*, 504 S.E.2d at 425.

The circumstances in which liability for intentional infliction of emotional distress has been imposed are extremely rare, and "firm judicial oversight is required in order to avoid losing control over the tort." *See Hines v. Hills Dep't Store,* 454 S.E.2d 385 (W. Va. 1994) and *Johnson v. Hills Dep't Store*, 488 S.E.2d 471, 476 (W. Va. 1997). The standard is so stringent that it is not enough even when a defendant "acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle" a plaintiff to punitive damages in another tort claim. *Harless*, 289 S.E.2d at 704-705.

The plaintiffs assert that, in determining whether the defendants' conduct rises to an outrageous level, the court must consider the totality of the circumstances. They contend that the totality of the circumstances herein demonstrates that the defendants "inserted themselves so deep into Plaintiffs' familial association that it saturated the Fourteenth Amendment rights under the Constitution" and "destroyed and broke down every facet of the family unit[.]" (ECF No. 89 at 19-20). They also suggest that the conduct of the prosecuting attorneys, Sims and Rasheed, in pursuing the harassing communications charges, which resulted in his incarceration and assault at the ERJ, is a direct causation of his emotional and physical injuries and "goes beyond any bounds of

decency." (ECF No. 112 at 20). The defendants, however, contend that none of the plaintiffs' allegations demonstrate conduct "beyond the bounds of human decency." (ECF No. 101 at 10).

The undersigned proposes that the presiding District Judge **FIND** that the allegations contained in the plaintiffs' Complaint do not rise to the high level of outrageousness necessary to support a claim of intentional or reckless infliction of emotional distress.

### 2. *Negligent infliction of emotional distress*

Count 70 of the Complaint also alleges that the "Supervisory Defendants were negligent in engaging in this conduct, from which it was reasonably foreseeable that Plaintiff would suffer emotional distress and psychological harm." (ECF No. 1 at 237, ¶ 1235). The Complaint further alleges that the "Supervisory Defendants further negligently ignored evidence demonstrating the Defendants' misconduct underlying the investigation." (*Id.*, ¶ 1236). Consequently, Michael claims that he "suffered humiliation, mortification, imprisonment, loss of custody of his children, and embarrassment, sleeplessness, and anxiety . . . ." (*Id.*, ¶ 1237). Notwithstanding the conclusory nature of these allegations, this claim fails as a matter of law.

It is well-established under West Virginia law that, absent a physical injury to the plaintiff, negligent infliction of emotional distress claims may only be maintained in three very limited circumstances, which are: (1) when the plaintiff witnesses a person closely related to him suffer critical injury or death as a result of the defendant's negligent conduct, *Heldreth v. Marrs*, 425 S.E.2d 157 (W. Va. 1992); (2) when the defendant negligently exposed the plaintiff to disease, causing emotional distress based on "fear of contracting a disease," *Marlin v. Bill Rich Constr., Inc.*, 482 S.E.2d 620 (W. Va. 1996);

and (3) for negligence in mishandling a corpse, *Ricottilli v. Summersville Mem'l Hosp.*, 425 S.E.2d 629 (W. Va. 1992).  The plaintiffs' case does not fall under these circumstances.

Furthermore, to the extent that Michael is relying on the physical and emotional injuries he suffered when he was sexually assaulted at the ERJ to support his claim of negligent infliction of emotional distress, he cannot meet the causation requirement under state law.  As noted in the reply briefs filed by the Prosecuting Attorney's Office Defendants, "a willful, malicious, or criminal act breaks the chain of causation" for the injury alleged to have been caused by prior negligence. *See Yourtee v. Hubbard*, 474 S.E.2d 613, 620 (W. Va. 1996).  (ECF No. 125 at 7; ECF No. 126 at 12; ECF No. 127 at 10).  Thus, because the intervening assault by the inmates at the ERJ was a willful, malicious, and potentially criminal act, Michael cannot claim that his injuries therefrom were proximately caused by the investigations and prosecutions at issue in this matter.

Because the plaintiff's allegations do not fall into any of these categories, the undersigned proposes that the presiding District Judge **FIND** that the Complaint fails to state a valid claim of negligent infliction of emotional distress against any of the defendants.  Consequently, the undersigned further proposes that the presiding District Judge **FIND** that Count 70 of the Complaint fails to state a plausible claim upon which relief can be granted against any of the defendants.

### E.    The plaintiffs lack standing to bring a Fourth Amendment claim arising out of the alleged unlawful seizure of S.F.

Counts 1, 2, 3, 22, 24, and 44 of the Complaint allege that various defendants violated Michael's rights under the Fourth and Fourteenth Amendments through the

unreasonable seizure of his minor child.[8]  However as asserted in the various defendants' motions, Fourth Amendment rights are personal rights and cannot be asserted on another's behalf.  Thus, even if the plaintiffs could establish that S.F. was "unreasonably seized" when she was held in the school offices to make her disclosures of alleged sexual abuse, any alleged violation of the Fourth Amendment would be personal to S.F. and cannot be vicariously asserted by Michael or Diane Frederick.  *See, e.g., Parker v. Austin*, 105 F. Supp.3d 592 (W.D. Va. 2015) (citing *Alderman v. United States*, 394 U.S. 165 (1969)).

In *Parker*, the district court dismissed Fourth Amendment claims brought by the parents of children who were removed from their home based upon suspected abuse, because only the children, not the parents, were seized).  The defendants herein assert that Michael's Fourth Amendment claims based upon the alleged seizure of his daughter on June 11, 2014 should suffer the same fate because they do not state a legally cognizable claim on his behalf.  On this basis, the undersigned proposes that the presiding District Judge **FIND** that Counts 1, 2, 3, 22, 24, and 44 of the Complaint, as pled, fail to state a plausible claim for relief against any of the defendants.

### F. The DHHR and its employees acting in their official capacities are not persons under 42 U.S.C. § 1983 and are entitled to absolute immunity under the Eleventh Amendment on all of the plaintiffs' claims.

Counts 4, 5, 16, 17, 25, 26, 28, and 38 of the Complaint assert claims against the DHHR and its employees named as defendants in their official capacities under 42 U.S.C.

---

[8]  The undersigned reads the citation to the Fourteenth Amendment in these counts to be acknowledging that the rights under the Fourth Amendment are incorporated against the States under the Fourteenth Amendment.  *See, e.g., Wolf v. Colorado*, 338 U.S. 25, 27-28 (1949), *overruled on other grounds by Mapp v. Ohio*, 367 U.S. 643 (1961).  Elsewhere in the Complaint, Michael asserts other counts concerning violations of his Fourteenth Amendment rights grounded in the alleged interference with his right to familial association, which will be separately addressed herein.

§ 1983 for alleged violations of Michael's Fourth and Fourteenth Amendment rights. Michael alleges that the DHHR inappropriately removed his child from his custody and care and then engaged in a conspiracy with other defendants to conceal exculpatory evidence, which, he alleges, prolonged an improper prosecution and interfered with or deprived him of his parental rights without due process of law.

The plaintiffs also assert claims against the DHHR Defendants under the West Virginia Constitution on behalf of both Michael Frederick (Count 68) and Diane Frederick (Count 69), based upon the same allegations of unfair proceedings and interference with their familial relations. Michael Frederick also asserts state law claims of invasion of privacy (Count 72), malicious prosecution (Count 74), and abuse of process (Count 75) against the DHHR and its officials.

However, as an arm of the State of West Virginia, the DHHR is immune from suit in federal court under the Eleventh Amendment to the United States Constitution, which provides that "the judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state." U.S. Const., Amend. XI.[9] It is clear that, regardless of the relief sought, the Eleventh Amendment bars suits by private citizens against a state, or its officials, in federal court, unless the state has specifically waived its right to immunity. *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 98-99, 101 (1984). Similarly, to the extent that the DHHR employees or

---

[9] Although not expressly stated in the amendment, the Eleventh Amendment has been held to bar suits against a state, or its officials, by its own citizens as well. *See Edelman v. Jordan*, 415 U.S. 651, 662-663 (1974).

representatives have been named as defendants in their official capacities, the claims against them would also be barred by the Eleventh Amendment.

A state can only waive its sovereign immunity by unequivocal expressions or actions. *Id.* at 99; *see also Edelman v. Jordan*, 415 U.S. 651, 673 (1921). Similarly, Congress can abrogate a state's immunity only where it has unequivocally expressed its intent to do so, and only where it has validly exercised its power. *Seminole Tribe v. Florida*, 517 U.S. 44, 54 (1996). The plaintiffs have not raised any claims under a statute in which Congress has clearly and unequivocally abrogated the State of West Virginia's Eleventh Amendment immunity, and the plaintiffs have failed to assert a meritorious argument that the State of West Virginia has waived its sovereign immunity or consented to be sued herein.

Although the DHHR Defendants did not specifically address the Eleventh Amendment immunity in their briefing, to the extent that sovereign immunity has been treated as being an issue of subject matter jurisdiction, the court may take it up *sua sponte* under Rule 12(h)(3) of the Federal Rules of Civil Procedure. Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the DHHR, and its employees in their official capacities, are immune from suit in this federal court under the Eleventh Amendment.

Additionally, as argued in the DHHR Defendants' motion, in *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989), the Supreme Court held that neither a state, including its agencies, nor its officials acting in their official capacities, are "persons" under § 1983. Section 1983 of Title 42 of the United States Code, which provides in pertinent part:

> Every person, who under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceedings for redress . . . .

42 U.S.C. § 1983. While not in itself a source of substantive rights, section 1983 provides a "method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979).

To successfully establish a section 1983 claim, "a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)) [Emphasis added]. In *Will*, the Supreme Court stated:

> Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself. We see no reason to adopt a different rule in the present context, particularly when such a rule would allow petitioner to circumvent congressional intent by a mere pleading device.
>
> We hold that neither a State nor its officials acting in their official capacities are "persons" under § 1983. The judgment of the Michigan Supreme Court is affirmed. [Citations omitted].

491 U.S. at 71. The plaintiffs' responses do not rebut this assertion.

The undersigned proposes that the presiding District Judge **FIND** that the DHHR and its employees in their official capacities are not persons who can be sued under section 1983. For these reasons, the undersigned proposes that the presiding District Judge **FIND** that Counts 4, 5, 16, 17, 25, 26, 28, 38, 68, 69, 70, and 72 fail to state a

plausible claim for relief against the DHHR and its employees in their official capacities and that such claims against them in that capacity should be dismissed.[10]

G. **The CHS, CASA, and NYAP Defendants are either not state actors under section 1983 or, if they are state actors, in their official capacities, they are also entitled to absolute immunity under the Eleventh Amendment and are not persons under § 1983.**

In Counts 5, 17, 20, 21, 26, 28, 39, 42, and 43, the plaintiffs allege that Children's Home Society, the Safe Haven Child Advocacy Center, CASA of the Eastern Panhandle, and the National Youth Advocacy Program, and their representatives named as defendants in their official capacities, violated Michael's rights under the Fourth and Fourteenth Amendments by aiding DHHR in the removal of his child from his custody; engaging in allegedly inappropriate treatment methods; and conspiring with DHHR and other defendants to violate his rights by concealing exculpatory evidence, resulting in the deprivation of his parental rights and the continuation of his criminal prosecutions without probable cause. These defendants, which are private entities, assert that they are not state actors and, thus, they are not "persons acting under color of state law" who can be held liable under section 1983.

The element of "acting under color of state law" requires conduct that is "fairly attributable to the state." *DeBauche v. Trani*, 191 F.3d 499, 506 (4th Cir. 1999) (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)). Thus, a person who is alleged to have violated a plaintiff's civil rights under section 1983 "must either be a state actor or have a sufficiently close relationship with the state actor so that the court would conclude that the private action may be 'fairly treated as that of the State itself.'" *Id.* at 506 (citing

---

[10] To the extent that these or other counts are brought against the DHHR employees in their individual capacity, such claims will be addressed separately herein.

*American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40 (1999)).  (ECF No. 69 at 7).  These defendants further note that "a presumption exists that private parties are not generally acting under color of state law."  *See Price v. Hawaii*, 939 F.2d 702, 707-08 (9th Cir. 1991).  (ECF No. 35 at 6-7; ECF No. 87 at 10).

The Supreme Court has held that joint action between a state actor and a private actor, alone, does not transform the private actor's conduct into "state action."  *DeBauche*, 191 F.3d at 506.  Rather, courts must "examine the interdependence between the state action and private actor's conduct showing that the state relied upon the private actor's conduct for continued viability."  *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 724 (1961).  (ECF No. 69 at 7).  Courts should additionally consider whether the state has control over the private actor's conduct, such that the private actor is "acting as a surrogate of the state."  *Id.* at 725.  (*Id.*)  The Fourth Circuit has established four categories under which a private party may be deemed a state actor:

> (1) when the state has coerced the private actor to commit an act that would be unconstitutional if done by the state; (2) when the state has sought to evade a clear constitutional duty through delegation to a private actor; (3) when the state has delegated a traditionally and exclusive public function to a private actor; or (4) when the state has committed an unconstitutional act in the course of enforcing a right of a private citizen.

*Andrews v. Fed. Home Loan Bank of Atlanta*, 998 F.2d 214, 217 (4th Cir. 1993).  "If the conduct does not fall into one of these four categories, then the private conduct is not an action of the state."  *Id.*  (ECF No. 69 at 8).[11]

The defendants further note that a private actor's employment relationship with the state does not always constitute state action.  *See Polk Cnty. v. Dodson*, 454 U.S. 312,

---

[11]  The plaintiffs characterize the Fourth Circuit's analysis as an application of three tests:  (1) the public function test; (2) the state compulsion test; and (3) the nexus/joint action test.  (ECF No. 89 at 12; ECF No. 104 at 10; ECF No. 106 at 10-11).

319 (1981) (a court-appointed public defender was not a state actor for the purposes of a § 1983 claim).   Rather, the Supreme Court emphasized that the private actor's "employment *function* should determine whether he or she acts under color of state law." *Id.* [Emphasis added].   In the instant matter, the CHS, CASA, and NYAP Defendants assert that they are not state actors and cannot plausibly be held liable under section 1983 for any of their conduct.   The undersigned will address each entity in turn.

### 1.   *The CHS Defendants*

As stated in their motion documents, Children's Home Society ("CHS") is a private, non-profit child welfare organization that provides child welfare and behavioral health services throughout West Virginia, including shelter care, mediation, parent education/training, visitation and reunification, and school based social work.   CHS operates the Safe Haven Child Advocacy Center ("CAC") where S.F.'s forensic interview took place.   CHS supports and coordinates the efforts of a team that includes law enforcement, prosecutors, child protective service workers, medical professionals, mental health professionals, and victim advocates.   (ECF No. 35 at 2).   In addition to CHS and CAC, the Complaint names as defendants Victoria Slater-Madert, Emily Hawver, and Deborah Barthlow, who are current or former employees of CHS.

The Complaint contains specific allegations concerning CHS and CAC surrounding the initial abuse and neglect investigation and defendant Slater-Madert's forensic interview of S.F. on June 13, 2014.   The transcript of that interview was entered as evidence in Michael's federal probation hearing.   Additionally, Slater-Madert testified in Michael's preliminary hearing on his sexual abuse charges and she introduced the audio recordings of the interview during that hearing.   Defendant Hawver, another employee of CHS, is alleged to have monitored S.F. while she was in foster care beginning in early July

2014, and allegedly became aware of her credibility issues. However, there are no other specific allegations concerning the CHS Defendants, other than to summarily allege that defendant Barthlow, as a supervisory defendant, knew or should have known about the conduct of her subordinates and failed to take any preventative or remedial action, and failed to properly train her subordinates in appropriate interview methods concerning abuse of minors.

The CHS Defendants emphasize that the Complaint fails to allege that West Virginia had regular involvement in its day-to-day operations, or control thereof, or that CHS served as a "conduit" for the State. (ECF No. 35 at 7). Concerning the conduct of the CHS Defendants, the plaintiffs respond:

> In this case, it is clear that Plaintiffs have sufficiently alleged in their complaint that Defendants CHS and Safe Haven [CAC] jointly participated in conjunction with Defendants Jefferson County Prosecuting Attorney's Office, Jefferson County Sheriff's Department and DHHR Child Protective Services which resulted in the malicious prosecution of Michael Frederick based on uncorroborated, unreliable and suggestibility of an unsound interview. * * * The Defendants' actions are that of either directing or taking directions from government agencies, therefore, by default they are a state agent.

(ECF No. 89 at 12-13).

In their Reply brief, the CHS Defendants contend that "[n]othing in the Complaint links Defendants' actions to the prosecutorial decisions of Jefferson County." (ECF No. 101 at 8). Their Reply further states:

> Defendants only interviewed S.F. following her serious accusations that Mr. Frederick committed sexual assault. [Citation omitted]. The prosecution's use of an interview as evidence in later criminal proceedings fails to equate to Defendants serving as state actors to allow Defendants to fall within the purview of § 1983. * * * No doubt, Defendants, in their private capacity, work with DHHR and law enforcement in properly responding to sexual assault allegations against children. However, simply working with a government agency does not make CHS a new West Virginia agency.

(*Id.* at 8-9).

### 2.    *The CASA Defendants*

CASA of the Eastern Panhandle is a regional branch of CASA, which is a private, non-profit corporation comprised of private volunteers who advocate for children in the legal and social services systems. (ECF No. 69 at 2). A CASA volunteer works with other members of the MDT in an abuse and neglect proceeding to find a safe, permanent home for the child. (*Id.* at 2-3). On June 30, 2014, the Circuit Court of Jefferson County appointed CASA volunteers to serve as advocates for S.F. The plaintiffs claim that CASA's role was to gather information, receipts, pleadings, orders, submission of reports to the Court, notice of attendance at any court proceedings, attend MDT meetings, conduct, and to closely monitor all matters related to the abuse and neglect proceedings. The plaintiffs further allege that Rebekah Overstreet, a CASA volunteer advocate assigned to S.F.'s case, was aware that S.F. made contradictory statements and had admitted to her family members that she had lied in her forensic interview.

The CASA Defendants' Memorandum of Law asserts that the State of West Virginia "has not coerced CASA and its volunteers to commit an act that would be unconstitutional if done by the state." (ECF No. 69 at 9). CASA's brief further asserts that "there is no indication that the State of West Virginia has evaded a clear constitutional duty by delegating responsibilities to CASA nor has it delegated traditional responsibilities of other state employees to CASA." (ECF No. 69 at 9). Their brief further asserts:

> CASA exists to assist state employees during legal proceedings involving abused children. CASA volunteers do not take the place of other necessary state employees within those investigations. In fact, West Virginia law specifically states that the appointment of a CASA volunteer does not abolish any responsibilities that *guardians ad litem* have to the court or the child. *See* W. Va. R. Child Abuse and Neglect P. Rule 52(g). Finally, the Plaintiffs have provided no factual support in their Complaint that the state

has committed a civil rights violation to enforce the right of CASA or its volunteers. As a result, CASA Defendants' actions do not fall within the four categories set forth by the Fourth Circuit in *Andrews*. Thus, its actions are not "state action" for purposes of § 1983.

(*Id.* at 9). The CASA Defendants also liken their court-appointed status to that of a public defender or court-appointed counsel, who are generally not considered to be state actors under section 1983. (*Id.* at 9-10). Their brief further states:

> Like court-appointed attorneys, CASA volunteers are not subservient to administrative directive from the state government. CASA volunteers operate under the training guidelines and compliance procedures set by the national CASA organization, not the West Virginia state government. Further, although CASA volunteers get involved with an abuse and neglect proceeding at the request of the court, the CASA volunteer serves the child involved in the court proceedings. Like the public defender in *Polk*, CASA volunteers are amenable to the children they serve as opposed to the state government that appoints them.

(*Id.* at 10).

> Concerning the CASA Defendants, the plaintiffs assert:

> In this case, it is clear that the Plaintiffs have sufficiently alleged in their complaint that Defendants participated during the legal proceedings. They were ordered by the Court to attend all court hearings, were delegated a traditionally and exclusive public function as a private actor. CASA Defendants['] duty was to the general welfare of any family member, parent, or guardians and closely monitor all matters until relieved by the court. CASA Defendants along with DHHR did not turn over records or report to the court as ordered, and did not look out for the general welfare of the family members or parents, which resulted in the malicious prosecution of Michael Frederick based on uncorroborated, unreliable and suggestibility of an unsound interview for which Defendants were made aware. Further records show Defendants were very involved in the MDT meetings on a regular basis where discussions centered on S.F.'s lying issues and recantations of her allegations. * * * Defendants have a sufficiently close state relationship and the nexus is met by actions that CASA was in charge of directing and participating in government functions and agencies, therefore, by default they are a state actor.

(ECF No. 104 at 10-11).

The CASA Reply contends:

> Plaintiffs' argument ignores United States Supreme Court precedent stating that a private actor's employment relationship with the state does not control the determination of whether the private actor is a state actor for the purpose of a 1983 claim. [*Polk*, 454 U.S. at 319]. Rather, the court also must analyze the private actor's employment function to determine if the private actor acts under color of state law. *Id.*

(ECF No. 117 at 4). The CASA Defendants again emphasize that "CASA advocates are amenable to the children they serve, not the state government that appoints them to the case. Therefore, they exercise judgment on behalf of the children and exercise independent professional judgment separate from the court that appoints them to a case." (*Id.*) They further contend that the plaintiffs have not set forth any facts demonstrating that the CASA Defendants fall into any of the four categories in *Andrews*. Thus, the CASA Defendants reassert that they are not state actors under section 1983. (*Id.* at 4-5).

### 3.    *The NYAP Defendants*

According to their motion documents, the National Youth Advocacy Program ("NYAP") is a private, non-profit child and family welfare program that operates in eight states, including West Virginia. "The NYAP contracts with public state and county child welfare departments and or juvenile justice systems and operates a diverse array of programs for families and children which vary from state to state." (ECF No. 87 at 4). The Complaint also names as defendants Rene Ellenberger, NYAP's West Virginia State Program Director, and Abigayle Koller, the Clinical Coordinator of West Virginia Operations for NYAP.

However, the only specific factual allegations concerning these defendants are that, on December 8, 2014, Koller participated in an MDT meeting, along with defendants Matschat and Duncan, during which S.F.'s veracity concerns were discussed. (ECF No. 1 at 65, ¶ 301). Additionally, the Complaint alleges that Koller was "working on S.F.'s lying

and transference issues" and that defendant Ellenberger, as her supervisor, knowingly or recklessly disregarded Koller's conduct and failed to train NYAP employees in appropriate methods of treatment. (*Id.* at 65, ¶ 302; *Id.* at 169, ¶ 763). Based upon these allegations, the plaintiffs contend that the NYAP Defendants participated in "bolstering S.F.'s trauma narrative," "filling in gaps in her story," and engaged in improper "trauma focused cognitive behavioral therapy;" thus, essentially coaching the alleged victim on her story. (*Id.* at 168-169, ¶ 757).

Like CHS, the NYAP Defendants simply assert that the Complaint fails to allege that West Virginia had regular involvement in its day-to-day operations, or control thereof, and that NYAP did not serve as a "conduit" for the State. (ECF No. 87 at 10). In response, the plaintiffs assert:

> In this case, it is clear the Plaintiffs have sufficiently alleged in their complaint that NYAP Defendants participated in state functions. NYAP Defendants contracted and were delegated a traditionally and exclusive public function as a private actor. NYAP Defendants actions resulted in the continuation of the malicious prosecution of Michael Frederick resulting in the loss of his freedom and family. * * * Clearly, NYAP Defendants have a sufficiently close state relationship and the nexus is met by actions of the NYAP Defendants. NYAP Defendants were in charge of directing a course of action and participating in government functions as an agency, therefore, by default they are a state actor.

(ECF No. 106 at 10, 12).

The NYAP Defendants' Reply reiterates their assertion that the State of West Virginia has no regular involvement in, or control of, their operations and that the named individuals were simply "performing their duly authorized responsibilities under the Child Welfare Act in association with various other entities, including entities of the State of West Virginia." (ECF No. 122 at 7). They maintain that this fact, standing alone, does

not make any actions of the NYAP Defendants "state action." (*Id.*) Their Reply further states:

> Next, Plaintiffs assert that the NYAP Defendants "contracted and were delegated a traditionally exclusive public function as a private actor" but provide no support for this manner that led to the continuation of the malicious prosecution of Plaintiff Michael Frederick by an entirely separate and distinct state entity. *See* [Doc. 106, pg. 10]. Plaintiffs have failed to demonstrate that the NYAP Defendants['] actions were in any way attributable to the State and have completely failed to demonstrate that any of the actions performed by the NYAP Defendants rose to a level required for conduct that is attributable to the state and liability of a private entity under Section 1983.

(*Id.*)

Based upon the allegations in the Complaint, and information provided by the parties in their motion documents, the undersigned proposes that the presiding District Judge **FIND** that the circumstances of this case fail to make these private entities state actors under the four exclusive categories set forth by the Fourth Circuit in *Andrews*.

### 4.    *Civil conspiracy with state actors*

Nonetheless, because the Supreme Court has expressly extended § 1983 liability to private persons who act in conspiracy with state actors, the court must also address the allegations that these private entities conspired with other defendants, who are state actors, to violate Michael's constitutional rights. *See Adickes v. SH Kress & Co.*, 398 U.S. 144 (1970).

To establish a civil conspiracy under section 1983, the plaintiffs must show that the defendants acted jointly in concert and that some overt act was done in furtherance of the conspiracy, which resulted in the deprivation of the plaintiff's constitutional rights. *Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996). Under those circumstances, courts may treat a private party acting in concert with state officials as

acting under color of state law – even if the state officials possess immunity for such conduct. *Dennis v. Sparks*, 449 U.S. 24, 27-28 (1980).

However, in order to hold the private entity liable under section 1983, "a plaintiff must prove that the private actor willfully participated in joint action with those acting under color of state law." *Area Local Am. Postal Workers Union, AFL-CIO v. City of Memphis*, 361 F.3d 898, 905 (6th Cir. 2004). More specifically, the plaintiff must demonstrate that "(1) a state official and private individual reached an understanding to deprive the plaintiff of his constitutional rights, and (2) the individual was a willful participant in joint activity with the State or its agents." *Hessami v. Corp. of Ranson*, 170 F. Supp.2d 626, 634 (N.D. W. Va. 2001).

> If a § 1983 claim is "based on an alleged 'joint participation' or 'conspiracy' between private actors and public actors, a bare assertion of a 'conspiracy' is insufficient, and a plaintiff must plead enough factual matter to plausibly suggest that an agreement was made to deprive [him or her] of [his or her] constitutional rights." *McFayden v. Duke Univ.*, 786 F. Supp.2d 887, 928 (M.D.N.C. 2011); *see also Howard v. Food Lion, Inc.*, 232 F. Supp.2d 585, 597 (M.D.N.C. 2002) (holding that in bringing a conspiracy claim under § 1983, the plaintiff "must allege both a mutual understanding to achieve some unconstitutional action reached by the private and state defendants and some factual assertions suggesting a meeting of the minds" and that "[w]hen a complaint contains merely a vague allegation of conspiracy, it cannot withstand a motion to dismiss.")

*Hardrick v. Canter*, No. DKC 11-3032, 2012 WL 5409739, at * 5 (D. Md. Nov. 5, 2012).

In the instant matter, the only remaining counts that specifically allege a conspiracy under § 1983 between state and private actors are Counts 5 and 26, which assert conspiracy claims against the County, Prosecutor's Office, Sheriff's Department, DHHR, and CHS Defendants.[12]  In Count 5, the Complaint alleges that these defendants:

---

[12] Other counts alleging a conspiracy or concerted action between a state actor and private entity appear to be contained in the § 1985 conspiracy counts, which the undersigned has recommended be dismissed for failure to state a claim.  Count 44 also alleges that the individual School, DHHR, and CHS Defendants acted

conspired and entered into express or implied agreements, understandings or meetings of the minds among themselves to deprive Plaintiff of his constitutional rights by charging and prosecuting him on charges [of] sexual assault, sexual abuse, obstructing an officer, fleeing an officer and sending alleged obscene, anonymous, harassing communications which these Defendants knew were not supported by probable cause."

(ECF No. 1 at 142-143, ¶ 591). The Complaint then alleges:

The Defendants willfully participated in this illegal objective by various means, with the intent to further some purpose of the conspiracy, including for example: (a) by refusing to consider exculpatory evidence of S.F. recantations, the negative gynecological examinations of S.F. and the psychological evaluations of S.F. and Plaintiff's alibi witness prior to the September 19 [sic; 16], 2014 indictments of Plaintiff; (b) intimidating and manipulating Plaintiff's alibi witness; (c) bolstering the trauma narrative on the part of the alleged victim S.F.; (d) the manufactured arrest of Plaintiff after the September 19 [sic; 16], 2014 indictments for sending alleged obscene, anonymous, harassing and threading [sic; threatening] communications; (e) making false statements to the Circuit Court of Jefferson County and Plaintiff's defense counsel in an effort to conceal unlawful conspiracy.

(*Id.* at 143, ¶ 592). The Complaint essentially repeats these allegations in Count 26 against the County, Prosecutor's Office, DHHR and CHS Defendants in their official capacity. (*Id.* at 180, ¶¶ 836-838).

The undersigned first notes that, of the private entities, these conspiracy allegations are directed only against the CHS Defendants. However, the actions allegedly taken in furtherance of the conspiracy include conduct taken by persons who are connected to CASA and NYAP, who are not named in these counts. Moreover, although the Complaint repeatedly alleges that the various private entities engaged in join conduct with the DHHR and the various county defendants, it does not sufficiently allege facts to

---

under color of law and in concert with one another to seize S.F in violation of the Fourth Amendment; however, as addressed above, neither Michael or Diane Frederick have standing to assert that claim.

support that there was a meeting of the minds or agreement among those defendants to violate either of the plaintiffs' constitutional rights.

Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the Complaint fails to sufficiently allege a civil conspiracy under section 1983 between the private entities and the state actors. Consequently, the undersigned further proposes that the presiding District Judge **FIND** that the plaintiffs have not demonstrated that the CHS, CASA, and NYAP Defendants were acting under color of state law in order to establish actionable section 1983 claims against them. Accordingly, the section 1983 claims against those entities should be dismissed.

Nonetheless, even if the District Court were to determine that the CHS, CASA, and NYAP Defendants were acting under color of state law, the claims against those entities and their employees or representatives in their official capacities must nonetheless be dismissed because those defendants would be entitled to absolute immunity under the Eleventh Amendment, similar to the DHHR. Furthermore, in their official capacity, those defendants would not be persons who can be sued under section 1983.[13] Accordingly, the undersigned proposes that the presiding District Judge **FIND** that Counts 5, 17, 20, 21, 26, 28, 39, 42, and 43 fail to state a plausible claim upon which relief can be granted against the CHS, CASA, and NYAP Defendants in their official capacities.

### H.   Certain defendants are entitled to absolute immunity under W. Va. Code § 49-2-810 and/or W. Va. Code § 29-12A-5(b).

Article 2 of Chapter 49 of the West Virginia Code (also known as the "Child Welfare Act") (hereinafter "CWA") sets forth the responsibilities of various parties with respect to

---

[13] Again, to the extent that additional claims are brought against the individual defendants associated with these entities in their personal capacity, the undersigned will address those claims *infra*.

the welfare of children. The Act includes statutes mandating that school employees, among others, who have reasonable cause to suspect child abuse or neglect must report the same to the DHHR and setting forth the procedures therefore. *See* W. Va. Code §§ 49-2-803; 49-2-809. The Act also provides absolute immunity from civil or criminal liability to persons who comply in good faith with the Act. *See* W. Va. Code § 49-2-810 ("Any person, official, or institution participating in good faith in any act permitted or required by this article are immune from any civil or criminal liability that otherwise might result by reason of those actions.")[14]

The DHHR, CHS, CASA, NYAP, and School Defendants all participated in some fashion in S.F.'s abuse and neglect proceedings. Those defendants assert that their actions with respect to the plaintiffs were performed in good faith in accordance with their duties under the CWA and that the Complaint does not allege or establish any conduct that would meet the exceptions to this immunity. The undersigned will address each set of defendants in turn.

### 1.    *The School Defendants*

Counts 19, 22, 28, 41, 44, 62, 68, 72, 74 and 75 contain claims against the School Defendants. As specifically alleged in the Complaint, on June 11, 2014, S.F. reported to defendant Brittingham that her father had inappropriately touched her. After receiving these allegations of abuse, Brittingham contacted the DHHR to report the allegations made by a student, as required by W. Va. Code §§ 49-2-803 and 49-2-809. Later that

---

[14] The DHHR Defendants' Motion to Dismiss cites W. Va. Code § 49-6A-6, which was the immunity provision under the CWA until May 17, 2015, when the West Virginia Legislature re-codified the CWA provisions in Article 2 of Chapter 49. The plaintiffs' allegations span the time period covered by both versions of the statute. Nonetheless, because the immunity provisions are identical, the amendment is of no material consequence. Accordingly, the undersigned will cite to the current statutory provision in section 49-2-810. To the extent that any citation to other specific provisions of the CWA is necessary, the undersigned will likewise cite to the current version of the Act.

day, a DHHR employee and a Jefferson County Deputy Sheriff met with and questioned S.F. at the school. At the end of the school day, S.F. was permitted to board a school bus, which she took to her great grandmother's house.

The Complaint contains no other specific factual allegations against Brittingham, and no factual allegations whatsoever concerning any of the other individual School Defendants. Rather, the plaintiffs simply seek to hold the other School Defendants vicariously liable, as supervisory officials, for Brittingham's conduct and for the alleged failure to properly train their employees in appropriate methods of seizing and detaining a child.

According to the School Defendants' motion documents, Bandy Shay Gibson, the current Superintendent for Jefferson County Schools, was not appointed to that position until May 19, 2015, and did not assume the duties of that position until July 1, 2015. Likewise, Brandon Caton, who is presently the Assistant Principal at BRES, did not assume that position until April 18, 2016, all well after the date that the alleged sexual abuse of S.F. was reported to the DHHR by Brittingham.

As will be discussed in greater detail *infra*, there is no basis to hold any of the School Defendants liable for any conduct after June 11, 2014. Accordingly, these supervisory defendants, who were not employed in those positions on that date, and who have not been alleged to have personally engaged in any conduct involving S.F. or Michael Frederick on that date, cannot be held liable in any capacity on the plaintiffs' claims for relief.

The plaintiffs appear to concede this point, as their response to the School Defendants' Motion to Dismiss fails to mention defendants Gibson and Caton at all, focusing instead on defendants Brittingham and Zigler, who was the Principal at BRES

on June 11, 2014.  Therefore, the undersigned proposes that the presiding District Judge **FIND** that the plaintiffs' Complaint fails to state any plausible claim for relief against defendants Gibson and Caton.

The plaintiffs have also named BRES and "the Jefferson County School District" as defendants herein.  However, these are not properly suable entities.  As noted by the School Defendants' motion documents, county school districts and their schools are under the control of the county's elected board of education.  *See* W. Va. Code §§ 18-5-1; 18-5-13(a).  Furthermore, W. Va. Code § 18-5-5 states in pertinent part that, "[t]he county board of education shall be a corporation by the name "The Board of Education of the County of . . . .' and as such, may sue and be sued . . . ."  Therefore, "the Jefferson County School District" is not the appropriate suable entity.  To the extent that any liability is attributable thereto, the suable entity would be the "Board of Education of the County of Jefferson."[15]

As further noted in the defendants' motion, individual schools operated by the county board of education are not independent entities which may be sued.  Accordingly, the undersigned proposes that the presiding District Judge **FIND** that any purported claims against BRES must be dismissed for failure to state a claim upon which relief can be granted.

The remaining School Defendants are Brittingham, Zigler and the JCBOE.  The School Defendants' motion documents assert that:

---

[15] The plaintiff's Response to the School Defendants' Motion to Dismiss suggests that the plaintiffs should be allowed to file an Amended Complaint to correct these misnomers.  (ECF No. 100 at 7-8).  The School Defendants filed their motion, in part, on behalf of the Board of Education of the County of Jefferson.  Thus, the undersigned sees no need for an Amended Complaint.  Rather, the court can simply substitute the Board of Education (hereinafter referred to as "JCBOE") as a party in place of the "Jefferson County School District."

By reporting her receipt of a student's allegations of sexual abuse to the WVDHHR, Mary Brittingham was acting in accordance with her duty as a mandatory reporter in compliance with the law. The Plaintiffs do not allege that Ms. Brittingham was not acting in good faith by making said report. As such, she is entitled to complete immunity from all claims asserted against her.

The claims against Dr. Gibson, Ms. Zigler, Mr. Caton, and the Board of Education all arise from Ms. Brittingham's report to the DHHR and are essentially claims of vicarious liability. As Ms. Brittingham cannot be held liable for fulfilling her duties as a mandatory reporter by the express provisions of the West Virginia Code, it follows that the other defendants also cannot be held liable and are also immune from suit. *See Hazlett v. Evans*, 943 F. Supp. 785 (E.D. Ky. 1996) (applying West Virginia and Kentucky mandatory reporting and immunity sections).

(ECF No. 84 at 9-10).

The plaintiffs' Response to the School Defendants' Motion to Dismiss contends that Brittingham and Zigler's action in holding S.F. out of the classroom without parental notification or consent, and putting her on the bus at the end of the day without notifying them of her allegations, was reckless. (ECF No. 100 at 11-12). They further contend that the interviews of S.F. at the school on June 11, 2014 were conducted improperly. (*Id.* at 12). Thus, it appears that the plaintiffs are attempting to argue that the conduct of these defendants was outside their scope of employment and the mandate for reporting of child abuse. (*Id.* at 12-14).

However, as noted by the School Defendants in their Reply, the plaintiffs do not specifically allege that these defendants acted in bad faith in the execution of their mandated duties and, indeed, the alleged conduct concerning the interview process and discharging S.F. at the end of the school day cannot be construed to have been taken in bad faith. (ECF No. 105 at 4). Brittingham's actions were within the scope of her mandated reporting duties under the CWA, for which she is entitled to absolute immunity.

Moreover, the remaining School Defendants, against whom no specific factual allegations have been pled, are likewise entitled to such immunity because any liability against them could only arise vicariously from Brittingham's conduct. Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the School Defendants are absolutely immune from liability on the plaintiffs' claims against them under W. Va. Code § 49-2-810.

As further noted in the School Defendants' motion documents, the West Virginia Governmental Tort Claims and Insurance Reform Act ("Tort Claims Act"), West Virginia Code §§ 29-12A-1 *et seq*., provides immunity to the employees of political subdivisions, such as the JCBOE, under certain circumstances. Specifically, section 29-12A-5(b) provides as follows:

> An employee of a political subdivision is immune from liability unless one of the following applies:
>
> (1) His or her acts or omissions were manifestly outside the scope of employment or official responsibilities;
>
> (2) His or her acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; or
>
> (3) Liability is expressly imposed upon the employee by a provision of this code.

W. Va. Code § 29-12A-5(b); *see also* Syl. Pt. 1, *Beckley v. Crabtree*, 428 S.E.2d 317 (W. Va. 1993), *modified on other grounds, Smith v. Burdette*, 566 S.E.2d 614 (W. Va. 2002); *Moore v. Wood Cty. Bd. of Educ.*, 489 S.E.2d 1 (W.Va. 1997); *Ali v. Raleigh Cty.*, No. 5:17-cv-03386, 2018 WL 1582721, *5-*6 (Mar. 29, 2018).

The School Defendants contend that the Complaint contains no allegations that any individual School Defendant acted outside the scope of his or her employment, or with a malicious purpose or in bad faith, or that such conduct was wanton or reckless.

Accordingly, they contend that they are entitled to absolute immunity under W. Va. Code § 29-12A-5(b).

The plaintiffs' Response to the School Defendants' Motion to Dismiss attempts to remedy this failure by asserting that defendants Brittingham and Zigler improperly held S.F. out of the classroom and permitted improper questioning of her without notification to or consent of her parents. Furthermore, the plaintiffs contend that these defendants recklessly allowed S.F. to board a school bus to go to her great grandmother's house, just as she allegedly did every day, without notifying her parents of the abuse allegations. Therefore, the plaintiffs' Response asserts that Brittingham and Zigler acted outside the scope of their employment and cannot rely upon the Tort Claims Act immunity provision.

The undersigned proposes that the presiding District Judge **FIND** that the allegations in the Complaint against the individual School Defendants do not establish that they acted outside the scope of their employment, or that that their alleged actions constituted bad faith, or that they acted recklessly or with a malicious purpose. Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that the individual School Defendants are entitled to absolute immunity on the claims against them under W. Va. Code § 29-12A-5(b). Consequently, the undersigned further proposes that the presiding District Judge **FIND** that Counts 19, 22, 28, 41, 44, 62, 68, 72, 74, and 75 fail to state a plausible claim upon which relief can be granted against the School Defendants.

## 2. *The DHHR, CHS, CASA, and NYAP Defendants*

As addressed in detail elsewhere herein, the individual employees of these entities named in the Complaint were each involved in some phase of S.F.'s abuse and neglect proceedings and participated in duties governed by the CWA, which would generally be

subject to immunity. Although there are no specific allegations of bad faith in the Complaint itself, the plaintiffs' responses to the various Motions to Dismiss attempt to establish that these defendants acted in bad faith in order to overcome the absolute statutory immunity. The undersigned will address the plaintiff's assertions concerning each of these groups of defendants in turn.

*a.    DHHR Defendants*

The plaintiffs allege that the DHHR Defendants withheld exculpatory evidence during the abuse and neglect proceedings, resulting in the relinquishment of Michael's parental rights and maliciously continued a criminal prosecution not supported by probable cause. They contend that these acts were well outside of the scope of the defendants' discretional and administrative duties. (ECF No. 91 at 11).

Further, Michael asserts that he requested documentation and records from the DHHR containing exculpatory information that were not released to him for use in his criminal proceedings in accordance with the constitutional requirements of *Brady*. The plaintiffs further assert that, despite Judge Sanders' order to release the exculpatory records, Sims delayed such release by filing a writ of prohibition on behalf of DHHR and the Jefferson County Prosecution Attorney's Office. Michael asserts that this bad faith concealment violated his clearly established due process rights. (*Id.* at 11-12).

However, the DHHR Defendants assert that, in refusing to disclose the records and seeking the writ of prohibition, the DHHR Defendants complied in good faith with the confidentiality provisions of W. Va. Code § 49-5-101 to not release such records absent a court order. They further assert that they played no other role in decisions concerning Michael's criminal prosecution, as those decisions were solely within the ambit of the Prosecuting Attorney's Office.

55

Because the DHHR Defendants complied with the controlling state statute, there was no fraudulent concealment and these defendants did not act in bad faith. Therefore, the undersigned proposes that the presiding District Judge **FIND** that the DHHR Defendants are entitled to absolute immunity under W. Va. Code § 49-2-810.

### b.    CHS Defendants

The CHS Defendants assert that the allegations against them solely relate to their efforts to protect children, including the CAC forensic interview of S.F., and monitoring S.F. while she remained in foster care. The CHS Defendants state that they worked diligently for three years to ensure her safety and, other than conclusory allegations, nothing in the Complaint suggests bad faith or warrants depriving them of their statutory immunity. (ECF No. 35 at 5-6).

The plaintiffs assert that Slater-Madert used inappropriate interview techniques during the CAC forensic interview, resulting in unreliable evidence that was then used to allow DHHR to obtain custody of S.F., and was also used to begin a malicious prosecution not supported by probable cause. They claim that the CAC interview was presented as evidence in various proceedings that prolonged his criminal prosecution without providing him an opportunity to refute the charges against him. (ECF No. 89 at 13-15).

In reply, the CHS Defendants state that the assertion that S.F.'s interview created an improper basis for Michael's arrest and prosecution is insufficient to overcome the immunity under section 49-2-810. The CHS Defendants assert that interviewing a child concerning her serious allegations of sexual abuse hardly runs afoul of the immunity provision and does not constitute bad faith. Rather, it is at the essence of the CWA, which clearly affords statutory immunity to individuals and institutions engaged in responding to allegations of child abuse. (ECF No. 101 at 4-5). The undersigned proposes that the

presiding District Judge **FIND** that the CHS Defendants are entitled to absolute immunity under section 49-2-810.[16]

c.     <em>CASA Defendants</em>

The CASA Defendants assert that the allegations in the Complaint involve them acting in the best interest of the child.  They contend that the plaintiffs have provided no facts showing any bad faith motive sufficient to deny them immunity under the CWA.  They further assert that CASA advocates participate in the litigation proceedings by making recommendations to the court regarding the best interest of the child and perform their duties for the sole purpose of protecting children.  (ECF No. 69 at 13-14).

The plaintiffs argue that the CASA Defendants should not be entitled to statutory immunity because, in this case, they failed to do independent gathering of information and prepare reports to update the judge on the content of the MDT meetings, and failed to inspect other agency records for material information.  The plaintiffs contend that the CASA Defendants generally failed to look out for the welfare of other family members, including the parent or guardian.  Finally, they assert that CASA's supervisory defendants failed to train defendant Overstreet in the appropriate methods of gathering facts and reporting information to the court, and that Overstreet allegedly intentionally failed to disclose matters to the court because she was part of the effort to conceal the exculpatory evidence from Michael.  (ECF No. 104 at 17-18).

Without any factual support therefore, the plaintiffs contend that the CASA Defendants had animus toward Michael because they classified him as a sexual predator,

---

[16] The CHS Defendants' Reply further correctly asserts that, to the extent that Slater-Madert appeared as a witness in any of the hearings in these proceedings, she would be entitled to absolute immunity for her testimony. *See Evans v. Perry*, 578 F. App'x 229, 231 (4th Cir. 2014) (citing *Vosburg*, 884 F.2d at 135). (ECF No. 101 at 6).  The undersigned agrees that Slater-Madert would receive such absolute immunity for her involvement as a witness in any of the applicable proceedings.

and that they participated in the efforts to turn Michael's wife against him, and collaborated with DHHR and the Prosecutor's Office to sustain the criminal charges. (*Id.* at 18-19).

In their reply, the CASA Defendants assert that, in attempting to show that they acted maliciously, the plaintiffs have added facts in their Response that were not contained in the Complaint, attributed alleged actions of other defendants to Overstreet with no factual support therefore, and speculated about further action that Overstreet did or did not take following her attendance at MDT meetings. The CASA Defendants emphasize that the Complaint does not state any facts regarding how Overstreet or other CASA Defendants acted maliciously or deprived Michael of his civil rights. (ECF No. 117 at 6).

Based upon the allegations contained in the Complaint, the undersigned proposes that the presiding District Judge **FIND** that the CASA Defendants are entitled to the absolute immunity provided in section 49-2-810.

> d.    *NYAP Defendants*

Finally, the NYAP Defendants assert that the allegations against them relate to their efforts to protect S.F., including participating in MDT review meetings, interviewing and conducting analysis of her safety, and working on her emergency placement following Michael's arrest on June 14, 2014, and his voluntary termination of parental rights on September 18, 2014. The NYAP Defendants contend that Michael failed to allege any facts against them that should deprive them of absolute immunity under the CWA. (ECF No. 87 at 8-9).

Michael asserts that NYAP's argument for immunity falls short because defendant Koller knew early on that S.F. had made numerous recantations and that there were gaps

in her story.  Furthermore, Koller attended MDT meetings on a regular basis where discussions centered on S. F.'s credibility, but she nonetheless participated in coaching S.F. in preparation of her criminal trial testimony.  The plaintiffs allege that Koller, and others, planted memories in S. F. using trauma therapy methods, and continued to work and collaborate with DHHR, CASA, CHS and the Prosecuting Attorneys to sustain the criminal charges.  (ECF No. 106 at 7-8).

Michael asserts that the "good faith" immunity is not available if the official actions had a malicious intent to cause a deprivation of constitutional rights or other injury. Michael further asserts that the NYAP Defendants deliberately acted with DHHR, CHS, CASA and the Prosecuting Attorneys to deprive him of his familial association with S.F. (*Id.* at 9).

In their reply, the NYAP Defendants assert that the only conduct specifically alleged against its defendants is that Koller allegedly acted in "bad faith" by participating in MDT meetings; in particular the December 8, 2014 meeting that occurred three months after Michael voluntarily relinquished his parental rights.  (ECF No. 133 at 5).  They further note that the plaintiffs addressed facts not contained in the Complaint and referenced exhibits which were not provided with their response.  (*Id.*)

The undersigned proposes that the presiding District Judge **FIND** that the plaintiffs have failed to demonstrate that the conduct of the NYAP Defendants was not done in good faith and, thus, the NYAP Defendants are entitled to the absolute immunity under section 49-2-810.

In summary, the undersigned proposes that the presiding District Judge **FIND** that the allegations in the Complaint are insufficient to overcome the absolute immunity afforded under W. Va. Code § 49-2-810 to the various DHHR, CHS, CAC, CASA, NYAP

Defendants in their personal capacities.  Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that Counts 60, 62, 63, 64, 68, 69, 72, 74, and 75 fail to state a plausible claim for relief against these defendants.

### I.    These same defendants are entitled to qualified immunity in their personal capacities.

To the extent that the School, DHHR, CHS, CASA, or NYAP Defendants are not entitled to absolute immunity, they contend that they are entitled to qualified immunity for their conduct.  Qualified immunity "shields government officials from liability for civil damages provided their conduct does not violate clearly established statutory or constitutional rights within the knowledge of a reasonable person." M*eyers v. Baltimore Cty.*, 713 F.3d 723, 731 (4th Cir. 2013).  The following test is used to determine whether a defendant is entitled to qualified immunity, and either factor may be addressed first:  (1) taken in the light most favorable to the party asserting the injury, do the facts alleged show the defendant's conduct violated a statutory or constitutional right; and (2) was that right clearly established such that a reasonable person would have known that their conduct was unlawful.  *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  A defendant is "entitled to a qualified immunity defense so long as 'the law did not put the [defendant] on notice that his conduct would be clearly unlawful.'"  *See Malley v. Briggs*, 475 U.S. 335, 341 (1986).  "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.  When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S.731, 743 (2011) (quoting *Malley*, 475 U.S. at 341).

With respect to the plaintiffs' Fourth Amendment claims, because none of these defendants was involved in the actual decisions to arrest and pursue the sexual abuse

charges against Michael Frederick, none of them engaged in conduct related to Michael's arrest and criminal prosecution of which a reasonable person under the circumstances would have known was unlawful.  Consequently, there appears to be no basis for the liability of these defendants for any violation of Michael's Fourth Amendment rights. Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the School, DHHR, CHS, CASA, and NYAP Defendants are entitled to qualified immunity on his Fourth Amendment claims.

Turning to the Michael's Fourteenth Amendment claims grounded in interference with his familial association or relations, the defendants assert that Michael voluntarily waived any rights concerning familial association when he relinquished his parental rights on September 18, 2014 (which, as pointed out by the DHHR Defendants, was done after both his court appointed counsel and the court made him aware of the rights he was waiving).  Furthermore, Michael did not appeal or otherwise contest the termination order and did not make any other efforts to regain his parental rights.  (ECF No. 102 at 4).

The undersigned agrees that Michael voluntarily waived such rights when he terminated his parental rights on September 18, 2014.  To the extent that Michael has asserted that his decision was coerced, that statement is meritless.  As confirmed by the defendants' briefs, he was fully advised of the rights he was giving up by both his court-appointed counsel, and the presiding Circuit Judge.  As further asserted by the defendants, Michael has taken no steps to appeal that decision or made any efforts to regain his parental rights.  Thus, it appears that he has no standing to assert a claim for damages based on the alleged interference with his non-existent parental rights.

The undersigned has located no precedent addressing a Fourteenth Amendment claim of interference with familial association asserted by a parent who had voluntarily terminated parental rights. Thus, there appears to be no clearly-established authority placing these defendants on notice that their alleged conduct was clearly unconstitutional. Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the School, DHHR, CHS, CASA, and NYAP Defendants are also entitled to qualified immunity on Michael Frederick's Fourteenth Amendment rights.

Consequently, the undersigned again proposes that the presiding District Judge **FIND** that Counts 60, 62, 63, 64, 68, 69, 72, 74, and 75 of the Complaint fail to state any plausible claim upon which relief can be granted.

### J.    The Complaint fails to state plausible and timely claims for relief against the Deputy Sheriff Defendants.

The remaining claims against the Deputy Sheriff Defendants (Counts 5, 6, 18, 23, 27, 40, 45, 61, 68, 73, 74, 75, and 76) stem from their involvement in the investigation, arrest, and prosecution of Michael Frederick on either the sex abuse, fleeing and obstruction charges, or on the subsequent harassing communications charges. The Deputy Sheriff Defendants largely assert that such claims are time-barred. To the extent that any such claims are not time-barred, these defendants assert that they are entitled to qualified immunity or immunity under the Tort Claims Act. The undersigned will discuss the various claims against the Deputy Sheriff Defendants in turn.

#### 1.    *Fourth Amendment malicious prosecution claims and companion claim under Article III, § 6 of the West Virginia Constitution*

Counts 5, 6, 23, 27, and 45 are brought under section 1983, asserting that the investigations of these criminal charges were insufficient and resulted in Michael's

unreasonable seizure and prosecution on charges that were not supported by probable cause, in violation of his Fourth and Fourteenth Amendment rights and Article III, § 6 of the West Virginia Constitution.  Under section 1983, such claims are addressed as Fourth Amendment claims grounded in the theory of a common law malicious prosecution claim. *See Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012) (citing *Lambert v. Williams*, 223 F.3d 257, 261 (4th Cir. 2000).[17]  To state a claim, the plaintiff must allege that the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in the plaintiff's favor.  *Id.*; *see also Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012).

Although malicious prosecution claims in West Virginia are subject to a one-year statute of limitations, Fourth Amendment claims under section 1983 are subject to West Virginia's general or residual personal injury statute of limitations of two years contained in W. Va. Code § 55-2-12.  *Owens v. Okure*, 488 U.S. 235, 248 (1989); *Collins v. Keller*, No. 5:17-cv-01330, 2018 WL 4659339, at *6 (S.D. W. Va. Sept. 28, 2018) (Berger, J.); *but see Coss v. Blatt*, No. 2:18-cv-01199, 2019 WL 357979, at *3 (S.D. W. Va. Jan. 29, 2019) (Copenhaver, S.J.) (applying one-year statute of limitations to § 1983 malicious prosecution type claim).

The Deputy Sheriff Defendants initially asserted that all of the plaintiffs' section 1983 claims and their state law claims are time-barred.  (ECF No. 80 at 4-7.)  However, with respect to the statute of limitations argument, the plaintiffs' Response to the Deputy

---

[17]  The Due Process Clause of the Fourteenth Amendment does not constitute a catch-all provision that provides a remedy whenever a state actor causes harm . . . . Rather, '[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Evans*, 703 F.3d at 646 n.2 (quoting *Albright v. Oliver*, 510 U.S. 266, 273 (1994)).  Thus, because the Fourth Amendment provides "an explicit textual source" for a section 1983 malicious prosecution claim, there is no basis for an alternative Fourteenth Amendment claim.  *Id.*

Sheriff Defendants' motion asserts that "any act performed during the course of this malicious prosecution is not time-barred because Plaintiffs filed their § 1983 action within the statute of limitations timeframe" based upon the date of dismissal of the sexual abuse charges on June 28, 2017.  (ECF No. 110 at 19).  As noted in *Brooks, supra*:

> Viewed in the light most favorable to Brooks, the allegations in his complaint may also be construed as seeking monetary damages, occurring after the issuance of process or arraignment, for an unconstitutional seizure that was accomplished pursuant to a warrant and was prolonged after Officer Barker knew or should have known Brooks was innocent. [Footnote omitted].  Because § 1983 actions seeking damages for unconstitutional arrest or confinement imposed pursuant to legal process—claims most analogous to the common-law tort of malicious prosecution—must allege and prove a termination of the criminal proceedings favorable to the accused, such claims do not accrue until a favorable termination is obtained. *Heck*, [], 114 S. Ct. at 2371; *Morrison v. Jones*, 551 F.2d 939, 940–41 (4th Cir.1977); *accord Simpson*, 73 F.3d at 136 n. 4; *Calero–Colon*, 68 F.3d at 3–4; *Singer*, 63 F.3d at 117–18. Consequently, the claim against Officer Barker is not time barred to the extent that Brooks alleges that his arrest warrant—applied for and executed by Officer Barker—was not supported by probable cause or that the officer continued the prosecution after he knew or should have known that Brooks was innocent.

85 F.3d at 183.  Relying upon *Brooks*, Michael asserts that his Fourth Amendment claims under section 1983 are equivalent to malicious prosecution claims and, thus, the statute of limitations should run from the date that the charges were terminated in his favor. (ECF No. 110 at 9).

In reply, the Deputy Sheriff Defendants assert that, even applying *Brooks*, the statute of limitations had still expired for all of Michael's section 1983 claims grounded in malicious prosecution, except as they pertain to the sexual abuse charges.  Thus, they reiterate that Michael's claims arising out of his arrest and prosecution on the harassing communications and obstructing and fleeing charges accrued when those charges were dismissed in his favor, both of which occurred more than two years before he filed the Complaint herein.

To the extent that Michael's claims arise out of his prosecution on the sexual abuse charges, because those charges were not resolved in his favor until June 28, 2017, such claims were timely filed within either a one or two-year statute of limitations. Nonetheless, because there were multiple findings of probable cause on those charges, in proceedings that were pursued and advocated by the prosecuting attorneys after Michael's arrest, including his indictment by a grand jury, the Deputy Sheriff Defendants assert that they are insulated from any liability for a Fourth Amendment violation thereon and should be entitled to qualified immunity for their conduct. *See Evans*, 703 F.3d at 647. (ECF No. 124 at 4-6).

The investigations of Michael began on June 11, 2014, when Moskowitz responded to BRES to investigate S.F.'s allegations of sexual abuse by her father and then accompanied a DHHR CPS worker to interview the parents and complete paperwork for a Temporary Protection Plan. Thereafter, the investigation was turned over to Demory, who participated in the interview of S.F. on June 13, 2014. Thus, Moskowitz is not alleged to have had any further involvement in these proceedings.

The Complaint further alleges that Demory attended S.F.'s forensic interview on June 13, 2014, and then swore out a criminal complaint charging Michael with sexual abuse charges based on S.F.'s statements on June 14, 2014. Later that night, Michael was arrested, pursuant to a warrant, by defendants Windle, Thomas, and Rjasko. As a result of his alleged resistance and attempt to flee during his arrest, on June 15, 2014, defendant Windle obtained an additional criminal complaint charging Michael with obstructing and fleeing an officer. Following his arrest, defendant Lupus allegedly contacted the Probation Office in the Eastern District of Virginia to report that Michael had been arrested.

The plaintiffs further allege that, as of June 19, 2014, Demory willfully ignored exculpatory evidence received from the June 18, 2014 forensic examination of S.F. and, at some point thereafter, Demory learned that S.F. had previously accused her mother's ex-boyfriend of substantially similar sexual abuse in Loudon County, Virginia. According to the Complaint, Demory subsequently spoke to one of the investigating officers about those allegations, which had been unsubstantiated. On July 3, 2014, Demory obtained a search warrant for S.F.'s diary, which allegedly contained exculpatory information.

However, the Complaint contains no allegations that Demory, or any other Deputy Sheriff Defendant, testified at Michael's preliminary hearing or in the subsequent grand jury proceedings, or that any Deputy Sheriff Defendant had any further direct involvement in the criminal proceedings pertaining to the sexual abuse, obstruction, or fleeing charges. Thus, the actions of these law enforcement officials pertaining to the investigation, arrest, and prosecution of Michael on those charges appear to have concluded with Michael's indictment on September 16, 2014, almost four years before the plaintiffs filed their Complaint. The obstruction and fleeing charges were subsequently dismissed upon motion of the prosecuting attorney on December 22, 2015, and the sexual abuse charges were, likewise, dismissed on June 28, 2017.

The only other specific factual allegations concerning actions taken by the Deputy Sheriff Defendants involve Demory's investigation of Michael for sending harassing text messages to his wife on April 26, 2015. After meeting with Michael's wife and obtaining copies of the text messages on April 28, 2015, Demory allegedly conferred with the prosecutors about pursing charges and subsequently swore out a criminal complaint for such charges. Liberally construing the Complaint to be alleging Demory's continued involvement in those proceedings, his participation ended with his testimony in the

magistrate court jury trial resulting in Michael's acquittal on the harassment charges on October 27, 2015.

Since all of his criminal proceedings terminated in his favor, Michael can satisfy the third element of a Fourth Amendment malicious prosecution claim.  However, he must also establish that each of these defendants acted maliciously to cause his seizure pursuant to legal process that was unsupported by probable cause.  The Fourth Circuit has long recognized that subsequent acts of independent decision-makers, such as prosecuting attorneys, grand juries, or judges, "may constitute intervening superseding causes that break the causal chain between a defendant-officer's misconduct and a plaintiff's unlawful seizure."  *Evans*, 703 F.3d at 647 (citing *Zahrey v. Coffey*, 221 F.3d 342, 351 (2d Cir. 2000)).  Thus, the "'intervening acts of other participants in the criminal justice system' insulate a police officer from liability."  *Id.*  The undersigned will address these elements with respect to each of the criminal prosecutions at issue.

### a.    The sex abuse charges

In the instant case, Demory applied for the criminal complaint charging Michael with the sexual abuse charges and obtained an arrest warrant from a magistrate on June 14, 2014.  According to the statement in support of the criminal complaint, Demory relied upon the statement S.F. had given at her school, which had been given to him by Moskowitz, and S.F.'s forensic interview on June 13, 2014.

While the plaintiffs allege that there were inconsistencies and inaccurate information in S.F.'s statements addressed in the criminal complaint and warrant application, there is no indication that either Moskowitz or Demory were actually aware of S.F.'s recantations or statements that she had lied at that point.  Rather, as noted by these defendants, they "received evidence that a minor child stated in plain words that

her father had molested her." (ECF No. 80 at 10). Accordingly, the Deputy Sheriff Defendants assert that the plaintiffs "have not alleged any facts which would indicate that Defendants Demory and Moskowitz acted maliciously or in bad faith" and "have not put forward any set of circumstances or allegations which would tend to indicate that these Defendants exercised anything other than a good faith judgment call to continue investigating Plaintiff Michael Frederick and ultimately pursue charges." (*Id.* at 9).

The Deputy Sheriff Defendants further assert that the Fourth Circuit has long held that, in determining whether a law enforcement officer acted unreasonably in obtaining an arrest warrant, "only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable will the shield of immunity be lost." *Torchinsky v. Siwinski*, 942 F.2d 257, 261 (4th Cir. 1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 344-45 (1986)). Otherwise, the officer should be granted qualified immunity.

The Deputy Sheriff Defendants contend that "the facts alleged by the Plaintiffs, even if true, give rise to, at least at the barest minimum, a good faith belief by Defendant Moskowitz that S.F.'s allegations warranted further investigation, and a good faith belief by Defendant Demory that his applications for arrest warrants were supported by probable cause." (*Id.* at 12). They further assert that, beyond conclusory allegations, the plaintiffs have not alleged facts to demonstrate that they acted maliciously. (*Id.*) Accordingly, these defendants contend that they are entitled to qualified immunity on the section 1983 claims against them.

The plaintiffs' Response to the Deputy Sheriff Defendants' motion attempts to overcome this immunity argument by questioning the reasonableness of the investigation done by Moskowitz and Demory prior to seeking the arrest warrant. They emphasize that

Demory did not interview the school staff or any family members and failed to verify the information in S.F.'s statements.  They further emphasize that S.F.'s inconsistencies and bizarre behavior should have served as a red flag concerning the credibility of her allegations.  (ECF No. 110 at 4-5).  They also question the timeline of the investigation, stating:

> The forensic examination of S.F. was performed four days after the arrest of Michael Frederick.  Defendant Demory learned of negative forensic examination on June 19, 2014, five days after the arrest of Michael Frederick.  The photo-magnification tissue forensic examination confirmed no physical or medical evidence consistent with either rape or traumatic assault [Citation omitted].  It was twenty-one (21) days after S.F.'s allegations of sexual abuse that Defendant Moskowitz submitted her official written report of "Action Taken for Initial Complaint of Juvenile Sexual Assault Complaint" to Detective Demory on July 2, 2014 without verifying any of S.F.'s claims reported in Defendant Brittingham's typed statement.  Twenty-two (22) days after Michael Frederick's arrest, DHHR removed S.F. from her great-grandmother's residence.  Upon arriving at the DHHR offices, S.F. told Defendant Driscoll and her *Guardian ad Litem* she had hidden a "diary" under some clothes in her playroom that she didn't want anyone to read; that she had lied to get her dad in trouble.  Defendant Demory immediately drew up a Search Warrant to recover S.F.'s diary . . . .

(*Id.* at 5).

The plaintiffs further assert that an officer "violates clearly established law when he makes material omissions that are 'deliberate . . . or show reckless disregard for the truth." *Franks v. Delaware*, 438 U.S. 154, 171 (1978); *Gregory v. City of Louisville*, 444 F.3d 725, 758 (6th Cir. 2006); *Beauchamp v. City of Noblesville, Inc.*, 320 F.3d 733, 743 (7th Cir. 2003).  (*Id.* at 6).  However, the plaintiffs further acknowledge that probable cause is determined at the moment the officer seeks the arrest based upon "facts and circumstances within the officer's knowledge and of which he had reasonably trustworthy information . . . ." *Beck v. Ohio*, 379 U.S. 89, 91 (1964).  (*Id.*)  They assert, without support

therefore, that Demory "intentionally or recklessly put lies before a magistrate or hid facts from the court due to his careless disregard for the truth." (*Id.* at 9).

Based upon the evidence known to him at the time and presented with the criminal complaint, it was objectively reasonable for Demory to believe that there was probable cause for Michael's arrest. Thus, even if subsequent evidence called probable cause into doubt, both Moskowitz and Demory appear to have exercised a good faith judgment to continue pursuing the sexual abuse charges, and both should be entitled to qualified immunity, including Demory for seeking the initial warrant.

Moreover, after that time, the prosecuting attorneys were responsible for presenting evidence at Michael's preliminary hearing and again before the grand jury, which resulted in additional findings of probable cause by the court and the grand jury. *See Gerstein v. Pugh*, 420 U.S. 103, 117 n.19 (1975) ("an indictment 'fair upon its face,' returned by 'a properly constituted grand jury,' conclusively determines the existence of probable cause."). Furthermore, there are no allegations or facts to support that Moskowitz or Demory deliberately supplied fabricated or materially misleading information to the prosecutors that would have tainted that process. *See Durham v. Horner*, 690 F.3d 183, 188-89 (4th Cir. 2012) (Other citations omitted).

Thus, the independent decision of the prosecutors to pursue the indictments, a process which Demory does not appear to have been a part of, serves as an intervening superseding cause for Michael's continued prosecution on those charges. *Evans*, 703 F.3d at 647. Pursuant to this authority, the undersigned proposes that the presiding District Judge **FIND** that Demory and Moskowitz are entitled to qualified immunity for their conduct in relation to the initial sexual abuse investigation and pursuit of an arrest warrant for Michael Frederick.

Additionally, the other Deputy Sheriff Defendants played no part in pursuing the sexual abuse charges and were only involved in his arrest on the facially-valid warrant,[18] or in reporting that arrest to authorities in another jurisdiction where Michael was on probation. *See Torchinsky*, 942 F.2d at 261. The undersigned proposes that the presiding District Judge **FIND** that Defendants Rjasko, Thomas, Windle, and Lupus are also entitled to qualified immunity because their conduct did not violate any clearly-established law of which a reasonable officer would have known with respect to the investigation and obtaining of the sexual abuse arrest warrant.

b.    *The obstruction and fleeing charges*

The same is true concerning the obstruction and fleeing charges, which the plaintiffs also assert were pursued maliciously and without probable cause, because "Defendant Windle's actions were nothing more than to add more charges on top of the existing criminal charges." (ECF No. 110 at 10). They add, "[t]hese actions by Defendants Rjasko, Thomas, and Windle show animus, ill will and spite towards Michael Frederick." (*Id.*)

According to the Complaint, after defendant Windle filed the criminal complaint and obtained the warrant from a neutral magistrate for Michael's arrest for obstructing and fleeing an officer, the prosecuting attorneys pursued and obtained an indictment on the same charges. Consequently, to the extent that Michael is alleging that those charges were not supported by probable cause, defendant Windle is insulated by the prosecutor's decision to pursue those charges through indictment and beyond. *See Evans*, 703 F.3d at 647. Additionally, none of the other Deputy Sheriff Defendants were involved in that

---

[18]  The undersigned will separately discuss Michael Frederick's allegations that the arresting officers unlawfully used force against him during the arrest.

process. Thus, the undersigned proposes that the presiding District Judge **FIND** that Windle is entitled to qualified immunity for his conduct.

Moreover, even if Michael could establish the essential elements of his section 1983 malicious prosecution claim against defendant Windle or any of the other Deputy Sheriff Defendants concerning the obstruction and fleeing charges, such a claim would be time-barred. The obstruction and fleeing charges were terminated in Michael's favor on December 22, 2015. Thus, the statute of limitations for a section 1983 claim concerning that prosecution expired on December 22, 2017. Because the Complaint herein was not filed until June 21, 2018, the undersigned proposes that the presiding District Judge **FIND** that this claim is untimely.

### c. *The harassing communications charges*

When Demory obtained the criminal complaint concerning the harassing communications charges against Michael on April 28, 2015, he allegedly did so at the behest of the prosecutors.[19] A neutral magistrate reviewed the complaint and issued an arrest warrant. Thus, an independent intervening decision-maker found probable cause, insulating Demory from liability. Thereafter, Demory testified at the magistrate court jury trial on the harassment charges (conduct for which he would be absolutely immune)[20] and Michael was acquitted of the charges on October 27, 2015.

---

[19] The plaintiffs further allege that Defendant Holz witnessed a discussion between Demory and Diane Frederick after the conclusion of the harassing communications trial, in which Demory again confirmed that he spoke with Sims about pursuing those charges. Beyond that singular allegation, which gives rise to no liability, there are no other allegations with respect to Holz. Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the Complaint fails to state any plausible claim against Holz.

[20] The common law absolute immunity provided to witnesses extends to a police officer who appears as a witness. Thus, the officer is absolutely immune from liability under section 1983 related to his testimony. *See Briscoe v. LaHue*, 460 U.S. 325, 335-336 (1983); *Day v. Johns Hopkins Health Sys. Corp.*, 907 F.3d 766, 779 (4th Cir. 2018) (quoting *Rehberg v. Paulk*, 566 U.S. 356 (2012) ("witness immunity 'may not be circumvented by claiming that a . . . witness conspired to present false testimony . . . .'")

Thus, the statute of limitations for a section 1983 malicious prosecution claim based thereon expired on October 27, 2017. Accordingly, even if Michael could establish the essential elements of a section 1983 malicious prosecution claim concerning the harassing communications charges, the undersigned proposes that the presiding District Judge **FIND** that his claims arising out of that prosecution are also time-barred.

For all of these reasons, the undersigned proposes that the presiding District Judge **FIND** that Counts 5, 6, 23, 27, and 45 of the Complaint fails to state a plausible claim for relief against any of the Deputy Sheriff Defendants.

### 2.    *State law claim of malicious prosecution*

The Deputy Sheriff Defendants similarly contend that Michael's state law claim of malicious prosecution contained in Count 74, in which Demory is the only Deputy Sheriff Defendant named, is time-barred under the applicable one-year statute of limitations to which such a claim is subject. Pursuant to the above analysis, any malicious prosecution claim against Demory with respect to the harassing communications charges is time-barred. However, because the sexual abuse charges were not dismissed until June 28, 2017, Michael's malicious prosecution claim thereon is timely under the one-year statute of limitations.

Nevertheless, similar findings to those made on the Fourth Amendment claim should be made with respect to Demory's conduct under the state law claim. Because Demory is not alleged to have had a role in the prosecution of the sexual abuse charges after the prosecutors conducted the preliminary hearing and then obtained the indictment, Demory should be insulated from any liability for the alleged malicious prosecution thereof. Accordingly, the undersigned proposes that the presiding District

Judge **FIND** that Count 74 of the Complaint fails to state a plausible claim for relief against Demory.

### 3.    *Fourth Amendment Excessive Force Claim*

The plaintiffs' Response to the Deputy Sheriff's Motion to Dismiss also addresses an alleged claim for the use of excessive force by defendants Windle, Thomas, and Rjasko during Michael's arrest on June 14, 2014, which is not specifically pled as a separate count in the Complaint. However, facts concerning the force used during the course of the arrest are set forth therein. Michael asserts that Windle and Rjasko slammed him to the deck outside his house and demanded that he give them his hands, and Thomas threatened to Taser him if he failed to comply. Michael further claims that these officers verbally assaulted him, calling him names and stating, "this is what happens to people who molest children." (ECF No. 1 at 26, ¶¶ 136-138; ECF No. 110 at 9-10).

When excessive force is alleged to have been used in the course of an arrest, such a claim is also governed by the Fourth Amendment, under the rubric of whether it was an unreasonable seizure. *See Graham v. Connor*, 490 U.S. 386, 394 (1989); *Tennessee v. Garner*, 471 U.S. 1 (1985) (force used during arrest is subject to the Fourth Amendment reasonableness standard). However, the Deputy Sheriff Defendants' Reply contends that this claim, to the extent that it is even appropriately before the court, is also barred by the applicable statute of limitations because the cause of action arose on June 14, 2014, when the force was allegedly used against Michael. (ECF No. 124 at 12-13). Thus, the statute of limitations expired two years later, on June 14, 2016, which was two years before the Complaint was filed. Accordingly, the undersigned proposes that the presiding District Judge **FIND** that, to the extent that a Fourth Amendment claim for use of excessive force by the Deputy Sheriffs is properly raised in the Complaint, it is time-barred.

### 4. *Fourteenth Amendment claim and companion claim under Article III, § 10 of the West Virginia Constitution*

In Counts 18, 40, 61, and 68 of the Complaint, Michael claims that the conduct of the Sheriff's Department Defendants violated his parental rights and interfered with his right to familial association in violation of the Fourteenth Amendment and Article III, § 10 of the West Virginia Constitution.   Similar to the findings made in the section concerning Michael's Fourteenth Amendment claims against the School, DHHR, CHS, CASA, and NYAP Defendants, Michael cannot establish that he has a clearly-established right to familial association under the circumstances, since he voluntarily relinquished his parental rights and waived any such rights he could assert thereunder.   Nor has he demonstrated that the conduct of the Sheriff Department Defendants with respect to his abuse and neglect and criminal proceedings shocks the conscience.   Thus, the undersigned proposes that the presiding District Judge **FIND** that the Deputy Sheriff Defendants are entitled to qualified immunity on Michael's Fourteenth Amendment claims.

### 5. *Abuse of process claim*

Count 75 of the Complaint contains an abuse of process claim in which Demory and Jefferson County Sheriff Pete Dougherty are named as defendants, among others.[21] Generally, an abuse of process consists of "the willful or malicious misuse or misapplication of lawfully issued process to accomplish some purpose not intended or warranted by that process." *Preiser v. MacQueen*, 352 S.E.2d 22, 28 (W. Va. 1985).   In

---

[21]  The other defendants named in this count are Brittingham and Gibson (School Defendants), Lorenzetti, Sims, Rasheed and Matschat (Prosecuting Attorney's Office Defendants), and Duncan and Driscoll (DHHR Defendants).   In other sections of this document, these other defendants have been determined to be entitled to absolute immunities, which would extend to their conduct related to this abuse of process count. Accordingly, the undersigned only addresses this claim with respect to the Sheriff's Department Defendants, who are not otherwise entitled to absolute immunity.

order to sufficiently state an abuse of process claim, the plaintiff must allege, "first, an ulterior purpose, and second, a willful act in the use of the process not proper in the regular conduct of the proceeding." *Westfield Ins. Co. v. Mitchell*, No. 2:12-CV-00585, 2013 WL 4742832, at *4 (S.D. W. Va. Sept. 12, 2013).

As further noted in *Preiser*, "[t]he authorities are practically unanimous in holding that to maintain the action [for abuse of process] there must be proof of a willful and intentional abuse or misuse of the process for the accomplishment of some wrongful object – an intentional and willful perversion of it to the unlawful injury of another." 352 S.E.2d at 28. The plaintiff's abuse of process claim asserts:

> Prior criminal proceedings and proceedings to terminate Plaintiff's parental rights were instituted and furthered by the Defendants. Defendants abused the legal process by using it for their ulterior motive or purpose to cause vexation, trouble, embarrassment, and damage to Plaintiff's professional reputation and damage to Plaintiff's reputation in the community.

(ECF No. 1 at 243-244, ¶¶ 1288, 1289). The Complaint then alleges that the defendants inappropriately used dolls and anatomical drawings in violation of appropriate protocol and coercively and abusively questioned S.F. in a manner that was "not in the regular pursuit of these allegations and claims." (*Id.* at 244, ¶ 1290).

Even taking these allegations as true, they do not appear to satisfy the essential elements of an abuse of process claim. The sole allegation in support of this claim is that the defendants used inappropriate questioning methods and protocol when questioning the child victim. At best, these allegations merely establish that, on June 13, 2014, S.F. was questioned by defendant Slater-Madert, as required by the CWA, with defendant Demory merely being present. The plaintiffs have not sufficiently established that the method of questioning S.F. was "not proper in the regular course of the proceeding" or a "willful and intentional perversion of it to the unlawful injury of another."

There is no liability where a defendant has done nothing more than carry out the process to its authorized conclusion even though done with bad intentions. [Cite] In this matter, the plaintiffs have not alleged that the conduct of any of the defendants was not authorized by the process or that the process was for an illegitimate purpose. Rather, despite the plaintiffs' assertion that the defendants had a bad motive to embarrass him, based upon the conduct alleged in this count of the Complaint, the defendants were merely carrying out the process to its authorized conclusion. Moreover, because an abuse of process claim is subject to a one-year statute of limitations in West Virginia, based upon the allegations contained in this count, it appears that this claim is untimely.

### 6.    *Invasion of privacy and false arrest claims*

The Deputy Sheriff Defendants further contend that Michael's invasion of privacy claim against them contained in Count 73 (which actually appears to be asserting claims of false arrest or false imprisonment) and his false arrest claim contained in Count 76 are also time-barred under the applicable one-year statute of limitations. In Count 73, the plaintiffs assert that defendants Demory, Windle, Rjasko, and Thomas, "arrested, physically restrained, and confined Plaintiff and deprived him of his personal liberty and freedom of movement for a period of sixteen months, all with the intention of confining him." (ECF No. 1 at 77).[22] In Count 76, the plaintiffs assert that the Sheriff's Department Defendants, acting with malice, deprived him of his liberty without legal justification and without his consent. (*Id.* at 244-45, ¶¶ 1294-1299). The plaintiffs do not rely on any other specific factual allegations within these counts.

---

[22] To the extent that other paragraphs within this count assert that Michael's arrest was without probable cause, such allegations have been addressed in a previous section.

The undersigned construes these conclusory allegations to be asserting claims of false arrest and/or false imprisonment under West Virginia law. The one-year statute of limitations for a claim of false arrest under state law begins to run on the date of the alleged false arrest. *See Canterbury v. Laird*, 655 S.E.2d 199, 201 (W. Va. 2007); W. Va. Code § 55-2-12. A claim of false imprisonment accrues under state law when a criminal defendant is detained pursuant to legal process. *Id.*

Although the plaintiffs have not provided any specific facts in these counts with respect to the arrest(s) they are challenging, based upon the factual allegations contained in the Complaint, it is apparent that these claims are untimely with respect to any arrests of Michael Frederick discussed therein. He was arrested by defendants Windle, Rjasko, and Thomas, based upon the arrest warrant obtained by Demory on the sexual abuse charges, on June 14, 2014. The following day, defendant Windle obtained an arrest warrant on the charges of fleeing and obstructing an officer. Thus, any claims based upon those arrests arose by June 15, 2014 and expired no later than June 15, 2015. Likewise, to the extent that these counts are also raising a false arrest claim based upon Michael's arrest on the warrant obtained by Demory on the harassing communications charges, that arrest occurred on May 2, 2015. Thus, any such claim on that basis accrued on that date and expired one year later, on May 2, 2016.

If, instead, Michael is again asserting that these arrests were maliciously pursued without probable cause, the analysis set forth above concerning his malicious prosecution claims would hold. Accordingly, the undersigned proposes that the presiding District Judge **FIND** that Counts 73 and 76 of the Complaint fail to state a plausible claim for relief against the Deputy Sheriff Defendants.

### K.    All of the Jefferson County Prosecutor's Office Defendants are absolutely immune from liability with respect to the plaintiff's claims against them.

The plaintiff has named former Jefferson County Prosecuting Attorneys Brandon C.H. Sims, Hassan Rasheed, and Lyndsey Matschat as defendants herein, as well as former Prosecuting Attorney Ralph Lorenzetti, on the basis of supervisory liability.  The remaining claims against these defendants are found in Counts 4, 5, 6, 18, 23, 25, 26, 27, 28, 45, 61, 71, 72, 74, and 75.

A prosecutor is a "quasi-judicial" officer who enjoys absolute immunity when performing prosecutorial, as opposed to investigative or administrative, functions.

In determining whether a prosecutor is entitled to absolute immunity, the court must apply a "functional approach," examining the nature of the function performed.  *Van de Kamp v. Goldstein*, 555 U.S. 335, 341-343 (2009).  It is well-established that prosecutors are absolutely immune "for their conduct in initiating a prosecution and in presenting the State's case, insofar as that conduct is 'intimately associated with the judicial phase of the criminal process.'"  *Burns v. Reed*, 500 U.S. 478, 486 (1991) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430-431 (1976)).

Further, absolute immunity extends to "actions preliminary to the initiation of a prosecution and actions apart from the courtroom."  *Buckley v. Fitzsimmons*, 509 U.S. 259, 272 (1993) (quoting *Imbler*, 424 U.S. at 431).  A prosecutor acts as an advocate or officer of the court when performing tasks such as:  (1) initiating a judicial proceeding; (2) presenting evidence in support of a search warrant application; (3) conducting a criminal trial, bond hearing, grand jury proceeding, or pre-trial hearing; (4) engaging in "an out-of-court effort to control the presentation of [a] witness's testimony;" and (5) making a "professional evaluation of the evidence assembled by the police and appropriate

preparation for its presentation at trial or before the grand jury after a decision to seek an indictment has been made." *Broadnax v.* Pugh, No. 5:15-cv-0376, 2017 WL 5617768, at * 3 (S.D. W. Va. Oct. 24, 2017), *adopted*, 2017 WL 5585630 (S.D. W. Va. Nov. 20, 2017) (citing Buckley, 509 U.S. at 272, quoting *Imbler*, 424 U.S. at 431); *Van de Kamp*, 555 U.S. at 434; *Debabnah v. Keller-Burnside*, 208 F.3d 467, 471-72 (4th Cir. 2000). Thus, a prosecutor "enjoys absolute immunity if the act is done in service of an advocacy function." *Safar v. Tingle*, 859 F.3d 241, 249 (4th Cir. 2017).

Most significantly, a prosecutor is absolutely immune even if he or she "acted with an improper state of mind or improper motive." *Shmueli v. City of New York*, 424 F.3d 231, 237-38 (2d. Cir. 2005); *Smith v. McCarthy,* 349 F. App'x 851, 859 (4th Cir. 2009); *Sample v. City of Woodbury*, 836 F.2d 913, 916 (8th Cir. 2016). Thus, a prosecutor "is entitled to absolute immunity despite allegations of his 'knowing use of perjured testimony' and the 'deliberate withholding of exculpatory information.'" *Imbler*, 424 U.S. at 431 n.34. "These principles are not affected by allegations that improperly motivated prosecutions were commenced or continued pursuant to a conspiracy." *Shmueli*, 424 F.3d at 237. Accordingly, prosecutors are entitled to absolute immunity for withholding materially exculpatory evidence or knowingly presenting false or misleading evidence to the Court or a grand jury. *Burns*, 500 U.S. at 490-92; *see also Brown v. Daniel*, 230 F.3d 1351, 2000 WL 1455443, at *2 (4th Cir. Sept. 29, 2000) (Table).

Additionally, the Fourth Circuit has extended absolute prosecutorial immunity to "[a]n attorney for the state who represents [the Department of Social Services] in a proceeding involving the alleged abuse and neglect of a child . . . ." *Ruach El v. Chang*, No. 2:17-cv-1915-RMG-BM, 2018 WL 672421, *5 (D.S.C. Jan. 10, 2018) (quoting *Shirley v. Drake*, No. 98-1750, 1999 WL 202671, at *2 (4th Cir. 1999)). Thus, so long as the

attorney for the DHHR herein was acting as an advocate in a prosecutorial role, she is entitled to absolute immunity. *See also Vosburg v. Dep't of Soc. Servs.*, 884 F.2d 133, 138 (4th Cir. 1989) (holding social workers are also absolutely immune from their decisions to file custody removal petitions).

Defendants Matschat, Rasheed, and Sims assert that they are entitled to absolute immunity for their alleged conduct in Michael Frederick's cases. (ECF No. 74 at 4-7; ECF No. 76 at 5-6; ECF No. 78 at 4-5). The plaintiffs contend that certain conduct by these defendants falls outside their prosecutorial functions and that they are not even entitled to qualified immunity for such conduct. The undersigned will address these arguments with respect to each defendant in turn.

### 1.    *Defendant Matschat*

Defendant Matschat's Memorandum of Law asserts that the plaintiff's allegations against her are "at their essence, claims that [she] prosecuted [Michael] for offenses of which she knew or should have known that there was doubt with regard to his guilt, and that he suffered various constitutional violations and injuries as a result of these prosecutions." Her Memorandum further states:

> [The plaintiffs] also claim that in the course of these prosecutions, Defendant Matschat allegedly improperly coached witnesses, concealed evidence, relied on manufactured evidence, and conspired with other county officials to effectuate these acts. [Citation omitted]. All of these alleged actions by Defendant Matschat occurred after [Michael] was arrested. Furthermore, all of Defendant Matschat's alleged actions were undertaken as a prosecutor pursuant to indictments and convictions, and therefore, even if they were undertaken with malintent (which is specifically denied), are not properly the grounds for a civil lawsuit. Thus, all of the Counts plead against Defendant Matschat by the Plaintiffs properly fall into the five (5) categories of tasks discussed in *Broadnax* for which a prosecutor is expressly immune from suit. See *Broadnax* at *9-13,

(ECF No. 74 at 6-7).

The plaintiffs' Response to Matschat's motion asserts that Matschat allegedly deliberately concealed purported exculpatory evidence during both the abuse and neglect and criminal proceedings, and improperly prepared witnesses to testify in the criminal proceedings. (ECF No. 113 at 4-5.) They further contend that Matschat is not entitled to a prosecutor's absolute immunity for actions taken in the abuse and neglect proceeding because, as counsel for the DHHR, she lacked prosecutorial discretion, and was required to advocate the position of the DHHR. (*Id.* at 3-4).

In reply, Matschat argues that the plaintiffs' assertion that the alleged concealment of evidence occurred during an "investigatory stage" is incorrect and does not constitute an actionable due process violation. Her Reply states:

> "Because a *Brady* violation does not occur until the prosecutor withholds the evidence at issue beyond a time at which it can be effectively used at trial by the defense, there is no designated "stage" at which it must be disclosed. Further, the evaluation and decision-making process of whether an item of evidence is disclosable under Brady is indisputably a prosecutorial function which is afforded absolute immunity and the Courts of this circuit have been express in that holding. *See Carter v. Burch*, 34 F.3d 257, 263 (4th Cir. 1994) (holding that prosecutors have absolute civil immunity for alleged *Brady* violations, because "[t]he decision whether to turn this evidence over to defense counsel would have occurred after [defendant]'s arrest, but before his conviction, and is clearly part of the presentation of the State's case.")

(ECF No. 125 at 4). Additionally, Matschat disputes the assertion that she is not entitled to absolute immunity for purportedly coaching witnesses, as preparing witnesses to testify is expressly within the scope of a prosecutor's duties. (*Id.* at 5). Finally, Matschat contends that case law explicitly provides absolute immunity to those prosecuting child abuse and neglect proceedings, whether the petition is pursued by a prosecuting attorney or a social worker. *See Vosburg*, *supra*, 884 F.2d at 135; *Shirley*, *supra*, 1999 WL 202671, at *2. Thus, she asserts that she is entitled to such immunity.

### 2.    *Defendant Rasheed*

Defendant Rasheed asserts that his alleged role herein was limited to participating in the prosecution of the felony sexual abuse charges and, after receiving evidence from an investigating law enforcement officer, recommending and directing that officer to pursue the harassing communications charges.  To the extent that the plaintiffs contend that such charges were not supported by sufficient evidence, Rasheed contends that his decisions are insulated by the absolute immunity provided to prosecutors for such functions.  His Memorandum of Law states:

> The Plaintiffs contend that Defendant Rasheed and the other prosecutors made a judgment call for which the Plaintiffs claim was contrary to their perception of the weight of the evidence.  This is exactly the purpose for which such immunity is extended; prosecutors must be free to exercise their professional judgment in the interests of justice without fear of a civil law suit following every acquittal.  Accordingly, both law and public policy demand the dismissal of all of Plaintiffs' claims against Defendant Rasheed due to prosecutorial immunity.

(ECF No. 78 at 5).

The plaintiffs' Response characterizes Rasheed's conduct as an investigator, rather than serving in an advocacy role in the following ways:

> Defendant Rasheed is not being sued because of prosecutorial functions "intimately associated with the judicial phase of the criminal process . . . Rather, the allegations concerning the investigative function and other non-prosecutorial acts that are not entitled to absolute immunity.  For example: (1) the Mental evaluation obtained without a court order or warrant[23]; (2) for concealing and withholding *Brady* evidence in an investigative stage. These functions are clearly not associated with his prosecutorial function or intimately related to a trial:  (1) manufacturing an arrest and giving legal advice to Detective Demory during a criminal investigation; (2) concocting false witness statements, even if evidence was intended for a future trial; (3) falsifying a sworn affidavit in support of a warrant application; (4) intimidating a witness to provide false inculpatory statements and disavowing prior exculpatory statements; (5) violating HIPPA [sic; HIPAA]

---

[23]  The undersigned does not read any of the factual allegations in the Complaint to support the plaintiffs' contention that Rasheed was somehow involved in Sims' procurement and use of the psychological evaluation.

laws with Defendant Sims by obtaining a copy of a protected document without a court order or a search warrant.

(ECF No. 114 at 13).

Rasheed's Reply disputes several of the plaintiffs' contentions. First, he contends that, to the extent that the plaintiffs stated that he assisted defendant Sims in obtaining Michael's psychological evaluation, the Complaint contains no such allegation and he asserts that there is no factual support therefor. (ECF No. 127 at 5). Additionally, Rasheed also asserts that there is no support for the plaintiffs' contention that the alleged *Brady* materials were withheld during an "investigative stage" of the proceedings, as Michael had already been indicted and had not yet been tried. (*Id.*) (citing *United States v. Smith Grading & Paving, Inc.*, 760 F.2d 527, 532 (4th Cir. 1985). Thus, he contends that he is indisputably afforded absolute immunity for the prosecutorial function of determining whether and when to disclose evidence. *Carter, supra*, 34 F.3d at 263. (*Id.* at 6).

Rasheed further contends that the plaintiffs' assertion that he would only be entitled to qualified immunity, if any, for improperly coaching witnesses is misplaced, as witness preparation is fully within the scope of a prosecutor's duties. (*Id.*) Moreover, Rasheed disputes the plaintiffs' contention that he merely advised defendant Demory that the text messages Michael sent to his wife constituted harassment, and that such conduct constituted an investigative role. Rasheed asserts that, in *Springmen v. Williams,* 122 F.3d 211, 213 (4th Cir. 1997), the Fourth Circuit held that the Supreme Court has recognized that a prosecutor's advice to a law enforcement official to pursue charges "falls squarely" under the umbrella of deciding "whether and when to prosecute," and that such conduct is subject to absolute immunity. Thus, Rasheed contends that he should receive absolute immunity for any role he played in that determination. (*Id.* at 6-7).

### 3.    *Defendant Sims*

Defendant Sims' arguments concerning her role in Michael's criminal proceedings largely mirror those of her co-defendants, insisting that she engaged in conduct in support of the prosecutorial functions of securing and pursuing the charges based upon her professional judgment of the evidence and her prosecutorial discretion.  (ECF No. 76 at 5-6).  The plaintiffs appear to take issue with Sims' attendance at proceedings for which she was not the prosecuting attorney; her decisions and influence concerning the presentation of evidence in Michael's post-arrest proceedings; her coordination of efforts with other prosecutors and other officials with respect to Michael's custody status and bond conditions; and her participation in the alleged coaching of witnesses and marshaling of evidence in preparation of the criminal cases, and her concealment of exculpatory evidence.  (ECF No. 112 at 4-9).

The plaintiffs contend that Sims further provided legal advice to Demory to pursue the harassment charges without probable cause, and then engaged in efforts to cover up her involvement in that decision by engaging her fellow prosecutor to file a false affidavit and misrepresent their actions before the court in an effort to maintain the "fabricated" harassment charges. (ECF No. 112 at 10).  Additionally, the plaintiffs contend that Sims stepped outside her role as a prosecutor to illegally obtain a copy of Michael's psychological evaluation and then attached it as an exhibit to her response to the ODC complaint that Michael had filed against her.  (*Id.* at 14-15).  In summary, the plaintiffs contend:

> Defendants Sims is not being sued because of prosecutorial functions "intimately associated with the judicial phase of the criminal process . . . Rather, the allegations concerning the investigative function and other non-prosecutorial acts that are not entitled to absolute immunity.  For example: (1) the Mental evaluation obtained without a court order or warrant so she

could present it to the West Virginia Disciplinary Board for the complaint filed against her for concealing and withholding *Brady* evidence. These functions are clearly not associated with her prosecutorial function or intimately related to a trial: (1) manufacturing an arrest and giving legal advice to Detective Demory during a criminal investigation; (2) concocting false witness statements, even if evidence was intended for a future trial; (3) falsifying a sworn affidavit in support of a warrant application; (4) intimidating a witness to provide false inculpatory statements and disavowing prior exculpatory statements; (5) violating HIPPA [sic; HIPAA] laws by obtaining a copy of a protected document without a court order or a search warrant.

(*Id.* at 19). Sims' Reply to these assertions incorporates the same arguments made by defendant Rasheed above.

Based upon an exhaustive review of the Complaint, the undersigned proposes that the presiding District Judge **FIND** that the prosecuting attorneys named as defendants in this matter are entitled to absolute immunity for their conduct as alleged in the Complaint, with one exception: defendant Sims' conduct in seeking out a copy of Michael Frederick's psychological evaluation prepared in a separate civil action, and attaching it to her response to his complaint against her with the West Virginia Office of Disciplinary Counsel. While that action may be subject to some other immunity, or may be dismissible on another basis, the undersigned finds that it was not a prosecutorial function subject to absolute immunity as being "intimately associated with the judicial phase of the criminal process."[24]

---

[24] The defendants' briefs argue that the psychological evaluation would be discoverable in the criminal proceedings as "reports of examination and tests" under W. Va. Rule Cr. P. 16(b)(1)(B). The allegations in the Complaint are unclear as to whether Sims' alleged attempt to fax the report to the Jefferson County Prosecutor's Office and to provide a copy to Michael's criminal defense counsel was an attempt to comply with that rule. Thus, the undersigned proposes no finding as to whether those actions were prosecutorial functions protected by absolute immunity. Rather, the undersigned will consider those facts as non-prosecutorial functions to the extent that the facts concerning the manner in which Sims obtained the evaluation and attached it to her response to the ODC Complaint, taken as true, support Michael's state law invasion of privacy claim against Sims in Count 71, which the undersigned will address *infra*.

Having found that the conduct of defendants Matschat, Rasheed and Sims, other than Sims' conduct surrounding the psychological evaluation, are afforded absolute immunity, the undersigned proposes that the presiding District Judge **FIND** that Counts 4, 5, ,6, 18, 23, 25, 26, 27, 45, 61, 68, 72, 74, and 75 of the Complaint fails to state a plausible claim for relief them.

### L.    The invasion of privacy claims in Counts 71 and 72 are time-barred.

In Count 71 of the Complaint, Michael alleges that Sims invaded his privacy by seeking a court order to release details of the CAC interview of S.F. for use in responding to the ODC Complaint Michael filed against her. The Complaint also alleges that Sims further invaded his privacy by attaching a copy of the ill-gotten psychological evaluation to her ODC response. (ECF No. 1 at 237-39, ¶¶ 1239-1252).

Sims' Motion to Dismiss asserts that her inclusion of that information with her response to the ODC complaint was a privileged communication because ODC proceedings are "quasi-judicial" and confidential. She further contends that public policy dictates that a prosecuting attorney accused of misconduct should be permitted to defend herself by providing relevant information to the proceedings, even if such information is unflattering to the complainant. (ECF No. 76 at 8-9). Notwithstanding these arguments, as further noted by Sims' briefs, Michael's invasion of privacy claim is time-barred.

Taking the allegations in the Complaint as true, Sims' response to the ODC Complaint was due on December 29, 2016. Presuming that the response was then filed, any invasion of privacy claim arose by that date, and the one-year statute of limitations to which such claims are subject in West Virginia expired on December 29, 2017. Because the Complaint herein was not filed until June 21, 2018, the undersigned proposes that the

presiding District Judge **FIND** that the invasion of privacy claim contained in Count 71 is untimely.

In Count 72 of the Complaint, Michael contends that Sims, Rasheed, Matschat, Demory, Hall, Duncan, Driscoll, Slater-Madert, and Brittingham invaded his privacy by obtaining information about intimate details of his family life through "unlawful and hostile questioning and interviewing" of S.F. To the extent that this claim against these various defendants is not otherwise barred by absolute or qualified immunity, this claim is also untimely, because the interviews of S.F., as alleged in the Complaint, occurred in June of 2014. Consequently, the undersigned proposes that the presiding District Judge **FIND** that the invasion of privacy claim contained in Count 72 is, likewise, time-barred.

### M. The plaintiffs' supervisory liability and *Monell* claims fail to state any plausible claim for relief.

Peppered throughout the Complaint are assertions that the various supervisory defendants named therein were aware of facts indicating that their subordinates were engaging in misconduct, and that they willfully ignored or were deliberately indifferent to that misconduct. It appears that the plaintiffs are attempting to hold the various supervisory defendants liable in both their official and personal capacities.

However, the claims against the supervisory defendants herein are even more attenuated than those against their subordinates. Essentially, the plaintiffs claim that supervisory officials of each entity sued herein were actually aware of evidence supporting Michael's innocence and the issues surrounding S.F.'s credibility, and were aware that their subordinates continued to pursue the prosecutions, and willfully ignored the conduct of their subordinates, which allegedly resulted in the violation of the plaintiffs' federal and state constitutional rights and amounted to various torts under state law.

The supervisory defendants cannot be held liable under a theory of *respondeat superior*, and the plaintiff's allegations concerning those supervisors are insufficient to give rise to a plausible claim of supervisory liability. *See Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984); *Shaw v. Stroud*, 13 F.3d 791, 798-799 (4th Cir. 1994) (supervisory liability is based upon "a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.")

In *Shaw v. Stroud*, 13 F.3d 791 (4th Cir. 1994), the Court held that supervisors may be liable for the actions of their subordinates where the supervisor, *by his own conduct*, was deliberately indifferent to, or tacitly authorized or approved, prior constitutional violations. Such liability is not based on *respondeat superior*, but rather upon "a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." 13 F.3d at 798 (*quoting Slakan v. Porter*, 737 F.2d 368 (4th Cir. 1984)). In *Shaw*, the Fourth Circuit discussed the following elements necessary to establish a supervisor's liability under 42 U.S.C. § 1983:

1)  The supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff;

2)  The supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices," and

3)  There was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injuries suffered by the plaintiff.

13 F.3d at 799.

Here, the claims against the supervisory defendants are too conclusory to plausibly give rise to an entitlement to relief. The only particular factual allegation pled against any of the supervisory defendants appears to be the allegation that, at the conclusion of the harassing communications trial on October 27, 2015, Michael's defense attorney advised defendant Lorenzetti that Sims and Rasheed "had lied to the Court and needed to be held accountable." (ECF No. 1 at 89, ¶ 405). Beyond that, the Complaint contains wholly conclusory allegations that the supervisory defendants were aware of the conduct of their subordinates and ratified or approved the same. However, those allegations are not factually supported in the Complaint.

Moreover, as addressed elsewhere herein, the subordinates of these supervisory employees are entitled to either absolute or qualified immunity for their conduct. Such immunity should, for the most part, be coextensive to the supervisors. Thus, the DHHR supervisors, and those of the CHS, CASA, and NYAP, are equally entitled to the absolute immunity provided under the Eleventh Amendment and the CWA, as that provided to their subordinates. Likewise, because the Sheriff's Department Defendants have been found to be entitled to qualified immunity for their actions, absent a specific factual allegation against Sheriff Dougherty in his personal capacity concerning his own conduct, he should also receive qualified immunity as the plaintiffs have not established that he violated any clearly-established right of which a reasonable officer would have known.

Finally, defendant Lorenzetti asserts that he did not play any direct role in the investigation, arrest, or prosecution of Michael Frederick, and cannot be held vicariously liable for the acts of his subordinates. (ECF No. 82 at 4). Nonetheless, to the extent that the Complaint does assert any specific allegations against him with respect to the

prosecutions undertaken by his subordinates, he contends that he is entitled to the same absolute prosecutorial immunity for those functions.

The undersigned proposes that the presiding District Judge **FIND** that, to the extent that the Complaint contains allegations concerning the conduct of the various supervisory defendants, such allegations are too conclusory to give rise to the individual liability of those defendants. Accordingly, to the extent that the plaintiffs seek to hold the supervisory defendants personally liable for their conduct, the undersigned proposes that the presiding District Judge **FIND** that the Complaint fails to state a plausible claim upon which relief can be granted.

Additionally, however, Count 28 of the Complaint contains a claim entitled "Violation of Plaintiff's Fourth and Fourteenth Amendment Rights (MONELL V. DEPT OF SOCIAL SERVS, 436 U.S. 6558 [sic; 658] (1977)] (*Against Supervisory Defendants in their Official Capacity)*. (ECF No. 1 at 184, ¶¶ 857-865). The Complaint fails to identify the specific supervisory defendants against whom this claim is brought. Nonetheless, it discusses the conduct of defendants Brittingham, Moskowitz, Demory, Duncan, Driscoll, and Slater-Madert. Thus, it appears to be aimed at the supervisors of the School, the DHHR, CHS, and the Sheriff's Department Defendants.[25] Turning to the Sheriff's Department, the supervisory defendant named herein is Sheriff Pete Dougherty. The undersigned also questions whether the plaintiffs intended to raise this claim against Ralph Lorenzetti, who was then the Jefferson County Prosecuting Attorney. In light of the various other counts seeking to hold the "Prosecutor's Office" defendants liable in

---

[25] To the extent that the undersigned has already addressed the alleged liability of all of the School Defendants, *supra*, and has found that the DHHR and CHS Defendants are entitled to absolute immunity in their official capacities under the Eleventh Amendment, the undersigned will not further address those defendants in this section.

their official capacities, the undersigned will address this claim as though it were also pled against Lorenzetti.  As previously noted herein, a suit against a public official in his official capacity is nothing more than a suit against the entity for which he is an agent.  *Burch v. Moore,* No. 5:05-cv-00831, 2007 WL 760527, at *8 (S.D. W. Va. Mar. 8, 2007).  Thus, to the extent that the Complaint alleges claims against defendants Lorenzetti and Dougherty in their official capacities as Prosecuting Attorney and Sheriff, the undersigned construes such claims to be brought against Jefferson County, which is a political subdivision (hereinafter "the County").[26]

To establish liability against a political subdivision, such as the County, under § 1983, a plaintiff must prove that a policy, practice, or custom of the political subdivision caused a constitutional deprivation.  *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694 (1978).  The Fourth Circuit has held that a plaintiff is required to establish the following three elements to demonstrate *Monell* liability: (1) a policy maker; (2) an official policy; and (3) a violation of constitutional rights whose "moving force" is the policy or custom.  *See Belcher v. Oliver,* 898 F.2d 32, 36 (4th Cir. 1990); *see also Burch*, 2017 WL 760527, at *8.  "The unconstitutional conduct must be directly attributable to the political subdivision through some sort of official action or imprimatur; [and,] isolated or single events of unconstitutional actions by employees will almost never trigger liability." *Burch,* 2017 WL 760527, at *8 (citing *Monell,* 436 U.S. at 694).

One exception to this general rule is where a plaintiff claims that a failure to train subordinates amounts to deliberate indifference to the rights of persons with whom the

---

[26]  As noted in their Motion to Dismiss, neither the Jefferson County Sheriff's Department or the Jefferson County Prosecuting Attorney's Office are suable entities.  Rather, the proper entity or entities to be sued are the elected officials of these offices or the Jefferson County Commission, which is the governing body of the County.  (ECF No. 72 at 4-5).

defendant comes into contact. *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Such deliberate indifference may be established where there is "some evidence that the [political subdivision] knew of a need to train and/or supervise in a particular area and the [political subdivision] made a deliberate choice not to take any action." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998). However, "[t]he Supreme Court had cautioned that the exception creating municipal liability under § 1983 for failure to train applies only in a very narrow range of circumstances and a municipality's culpability 'is at its most tenuous where a claim turns on failure to train.'" *Mingo v. City of Mobile, Ala.,* 198 F. App'x 8893, 896 (11th Cir. 2014) (citing *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S.397, 398 (1997) and *Connick v. Thompson*, 563 U.S.51, 61 (2011)).

In the instant matter, the Complaint is replete with conclusory allegations that the various entities had a policy or custom consisting of failing to train their employees in various areas including appropriate methods for seizing and detaining individuals; appropriate methods of interviewing children, investigating child abuse, and treatment for allegedly abused minors; and appropriate methods for turning over exculpatory evidence. The Complaint fails to allege any specific deficiencies with the training provided by any of the entities named in the Complaint. Rather, the plaintiffs appear to rely on the adage that, because this allegedly happened to me, it must happen regularly. Such allegations are simply insufficient to hold these defendants liable herein.

As noted in the Memorandum of Law filed by defendants Lorenzetti and Dougherty, in *Revene v. Charles Cty. Comm'rs,* 882 F.2d 870 (4th Cir. 1989), the Fourth Circuit held that such claims fail where the "critical allegations of a municipal . . . are asserted entirely as legal conclusions," and "there are not supporting facts of even the most general nature to suggest any specific deficiencies." (ECF No. 82 at 6).

Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the Complaint fails to state a plausible claim sufficient to establish *Monell* liability against any of the defendants, and that the claim contained in Count 28, in particular, must be dismissed. Additionally, the undersigned proposes that the presiding District Judge **FIND** that the plaintiffs have failed to demonstrate an entitlement to any of the injunctive relief sought in the Complaint, which arises out of such alleged policies and customs.

### N. The Complaint fails to state any plausible claim for relief on behalf of Diane Frederick.

To the extent that the Complaint names Diane Frederick as a plaintiff in the role of Michael Frederick's Power of Attorney, that role confers no standing for her to pursue claims on Michael's behalf herein. There is no indication that Michael is legally incompetent or otherwise unable to represent himself in this matter, and as *pro se* litigants., Diane Frederick cannot represent him in federal court.

Nonetheless, the Complaint does appear to raise two potential claims asserted by Diane Frederick in her own behalf: a claim under the Fourth Amendment, and its counterpart in Article III, § 6 of the West Virginia Constitution, against defendant Sims arising out of Diane's arrest on or about February 13, 2017, which was not specifically pled in any particular count of the Complaint; and a claim under the Fourteenth Amendment and its counterpart in Article III, § 10 the West Virginia Constitution, specifically contained in Count 69, for interference with her familial relationships without due process of law, which is only brought against the DHHR.

Diane's Fourth Amendment claim fails to state a claim upon which relief can be granted because Diane was not arrested by any of the defendants herein. In fact, she was

arrested by the Berkley County, West Virginia Sheriff's Department.  Moreover, to the extent that Diane is asserting that Sims' conduct in obtaining a copy of her son's psychological evaluation from Sherman Lambert's office caused her arrest for confronting Lambert, her claim lacks merit because she cannot demonstrate such causation.  Diane's own conduct, as well as Lambert's conduct in seeking to press charges against her, are intervening and superseding causes for any alleged Fourth Amendment violation Diane may have suffered as a result of that arrest.  Moreover, the decision to arrest Diane made by Berkley County officials, who are not defendants herein, also breaks that causal connection.  Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the Complaint fails to state a plausible claim for relief against Sims with respect to Diane Frederick's alleged Fourth Amendment claim and her companion claim under Article III, § 6 of the West Virginia Constitution.

Additionally, to the extent that she has standing to bring such a claim, Diane's claims asserting violations of her rights under the Fourteenth Amendment and Article III, § 10 of the West Virginia Constitution for interference with her familial relations or association also fails because that claim is only brought against the DHHR, which, as previously stated herein, is absolutely immune from liability in this federal court under the Eleventh Amendment.

### O.    The plaintiffs' claim for punitive damages is barred by state law and they are not entitled to attorney fees and costs.

To the extent that the Complaint asserts a claim for punitive damages, the undersigned propose that the presiding District Judge **FIND** that such damages are barred against both the state and county defendants.  As to the state defendants, to the extent that such monetary damages are not otherwise barred by the Eleventh

Amendment, W. Va. Code § 55-17-1(a) provides that "no government agency may be subject to awards of punitive damages in any judicial proceeding." Likewise, section 55-174(3) provides that "No government agency may be ordered to pay punitive damages in any action." Punitive damages are also prohibited against the county defendants under W. Va. Code § 29-12A-7(a). Additionally, to the extent that the Complaint has made a request for recovery of attorney fees and costs, because the plaintiffs are proceeding *pro se*, they would not be entitled to any such recovery even if they were successful on any of their claims. *See Kay v. Ehrler*, 499 U.S. 432 (1991); *Maple v. Dunham*, 56 F.3d 77 (10th Cir. 1995).

## RECOMMENDATIONS

For the reasons stated herein, it is respectfully **RECOMMENDED** that the presiding District Judge **DENY AS MOOT** the DHHR Defendants' first Motion to Dismiss (ECF No. 13) and **GRANT** all of the other Motions to Dismiss filed by the defendants (ECF Nos. 34, 37, 68, 71, 73, 75, 77, 79, 81, and 83), and dismiss this civil action, in its entirety, from the docket of the court.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, Chief United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such

objection.  Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).  Copies of such objections shall be provided to the opposing parties and Chief Judge Johnston.

The Clerk is directed to file this Proposed Findings and Recommendation, to mail a copy of the same to the plaintiff and to transmit a copy to counsel of record.

February 15, 2019

Dwane L. Tinsley
United States Magistrate Judge